## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRENNAN CENTER FOR JUSTICE,<br>120 Broadway, #1750<br>New York, NY 10271<br><br>THE PROTECT DEMOCRACY PROJECT,<br>INC., 2020 Pennsylvania Avenue, NW, #163<br>Washington, DC 20006,<br><br>      Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, 245 Murray Lane, SW<br>Washington, DC 20528<br><br>U.S. GENERAL SERVICES<br>ADMINISTRATION, 1800 F Street, NW,<br>Washington, DC 20405<br><br>OFFICE OF MANAGEMENT AND BUDGET,<br>725 17th Street, NW<br>Washington, DC 20503<br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:17-cv-6335-KBF |

## AMENDED COMPLAINT

Plaintiffs Brennan Center for Justice ("Brennan Center") and The Protect Democracy

Project, Inc. ("Protect Democracy") (collectively, "Plaintiffs") bring this action under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel defendants U.S. Department

of Justice ("DOJ"), U.S. Department of Homeland Security ("Homeland Security"), U.S.

General Services Administration ("GSA") and U.S. Office of Management and Budget ("OMB")

(collectively, "Defendants") to disclose records regarding the "Presidential Advisory Commission on Election Integrity" (the "Commission") requested by Plaintiffs under FOIA.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

2.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B).

## PARTIES

3.    Plaintiff Brennan Center for Justice at N.Y.U. School of Law is a not-for-profit nonpartisan law and policy institute that seeks to improve the nation's systems of democracy and justice.  The Brennan Center works to eliminate barriers to full political participation and to ensure that public policy and institutions reflect all members of our diverse society.  The Brennan Center regularly writes and publishes articles and makes appearances in a wide range of media outlets regarding voting rights, election administration, and government oversight.  The Brennan Center maintains offices in New York City and in Washington, DC.

4.    Plaintiff Protect Democracy is an organization awaiting section 501(c)(3) status, incorporated under the laws of the District of Columbia.  Protect Democracy's mission is to prevent those in power from depriving Americans of a free, fair, and fully-informed opportunity to exercise ultimate sovereignty.  As part of this mission, Protect Democracy seeks to inform public understanding of operations and activities of the government by gathering and disseminating information that is likely to contribute significantly to the public understanding of executive branch operations and activities.  Protect Democracy regularly requests such

government information pursuant to FOIA.  Protect Democracy has been held to be an organization that is "primarily engaged in disseminating information."[1]

 5. Defendant DOJ is an agency of the executive branch of the federal government of the United States and includes the Office of Information Policy and Office of Legal Counsel. DOJ is headquartered at 950 Pennsylvania Avenue, NW, Washington, DC 20530.  DOJ is an "agency" within the meaning of 5 U.S.C. § 552(f), and, upon information and belief, has possession, custody, and control of documents that Plaintiffs seek in response to their FOIA requests.

 6. Defendant Homeland Security is an agency of the executive branch of the federal government of the United States.  Homeland Security is headquartered at 245 Murray Lane, SW, Washington, DC 20528.  Homeland Security is an "agency" within the meaning of 5 U.S.C. § 552(f), and, upon information and belief, has possession, custody, and control of documents that Plaintiffs seek in response to their FOIA requests.

 7. Defendant GSA is an agency of the executive branch of the federal government of the United States.  GSA is headquartered at 1800 F Street, NW, Washington, DC 20405.  GSA is an "agency" within the meaning of 5 U.S.C. § 552(f), and, upon information and belief, has possession, custody, and control of documents that Plaintiffs seek in response to their FOIA requests.

 8. Defendant OMB is an agency of the executive branch of the federal government of the United States.  OMB is headquartered at 725 17th Street, NW, Washington, DC 20503. OMB is an "agency" within the meaning of 5 U.S.C. § 552(f), and, upon information and belief,

[1] *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, No. 17-CV-00842 (CRC), 2017 WL 2992076 (D.D.C. July 13, 2017).

has possession, custody, and control of documents that Plaintiffs seek in response to their FOIA requests.

## STATEMENT OF FACTS

### A. President Trump's Advisory Commission on Election Integrity

9.      On May 11, 2017, President Donald J. Trump issued Executive Order 13799 establishing a "Presidential Advisory Commission on Election Integrity," ostensibly to "promote fair and honest Federal elections." According to the Executive Order, the Commission is "study[ing] the registration and voting processes used in Federal elections." The Executive Order provides that the Commission shall submit a report to the President that identifies "those laws, rules, policies, activities, strategies, and practices" that either "enhance" or "undermine" "the American people's confidence in the integrity of the voting process used in Federal elections," and "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registration and improper voting, including fraudulent voter registrations and fraudulent voting."

10.      The Commission is chaired by the Vice President of the United States, and its vice chair is Kansas Secretary of State Kris Kobach.

11.      Other members of the Commission include Hans von Spakovsky (Senior Legal Fellow, Heritage Foundation), J. Christian Adams (President and General Counsel, Public Interest Legal Foundation), and Ken Blackwell (Former Ohio Secretary of State). These commissioners have long records of championing measures that impede eligible voters from participating in elections. For example, von Spakovsky helped lead an effort in 2005 to pass a law in Georgia which required people to present government-issued photo identification to vote as well as efforts to promote aggressive purges of state voter rolls in and around 2008. He is

seen as one of the leading figures in the country in promoting policies to reduce access to voting by claiming widespread voter fraud.[2]  Similarly, Adams has a history of promoting voting restrictions.  He serves as the president and general counsel of the Public Interest Legal Foundation, which works to promote aggressive purges of voter rolls and promotes the idea that non-citizens vote in large numbers.[3]  And Blackwell has implemented policies that restricted voting access in Ohio in 2004 and 2006, including a policy of rejecting voter registration forms that were not submitted on a certain grade of card stock, and a policy of limiting access to provisional ballots in violation of federal law.[4]

12.  In public statements leading up to the creation of the Commission, President Trump has suggested that the Commission's purpose would be to substantiate the President's conviction, not founded in any credible evidence, that voter fraud is rampant in U.S. elections. On November 27, 2016, for instance, President Trump tweeted that "[i]n addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally."[5]  On January 23, 2017, President Trump told congressional leaders that 3 to 5 million "illegals" had voted in the 2017 federal election.[6]  Subsequently, on January 25, 2017,

---

[2] Alex Horton & Gregory S. Schneider, *Trump's Pick to Investigate Voter Fraud Is Freaking Out Voting Rights Activists*, WASHINGTON POST, June 30, 2017, *available at*
https://www.washingtonpost.com/news/post-nation/wp/2017/06/30/trumps-pick-to-investigate-voter-fraud-is-freaking-out-voting-rights-activists/?utm_term=.d5e907e50cfd.

[3] *Meet the Members of Trump's 'Voter Fraud' Commission*, Brennan Center for Justice, July 18, 2017, https://www.brennancenter.org/analysis/meet-members.

[4] *Id.*

[5] Cleve R. Wootson Jr., *Donald Trump: 'I Won the Popular Vote if You Deduct the Millions of People Who Voted Illegally,* WASHINGTON POST, Nov. 27, 2017, *available at*
https://www.washingtonpost.com/news/the-fix/wp/2016/11/27/donald-trump-i-won-the-popular-vote-if-you-deduct-the-millions-of-people-who-voted-illegally/?utm_term=.eed362335b3e.

[6] Abby Phillip & Mike DeBonis, *Without Evidence, Trump Tells Lawmakers 3 Million to 5 Million Illegal Ballots Cost Him the Popular Vote*, WASHINGTON POST, Jan. 23, 2017, *available at*
https://www.washingtonpost.com/news/post-politics/wp/2017/01/23/at-white-house-trump-tells-congressional-leaders-3-5-million-illegal-ballots-cost-him-the-popular-vote/?utm_term=.50b6369f474a.

President Trump tweeted that he would be "asking for a major investigation into VOTER FRAUD."[7]

13.     On information and belief, the Commission was also created to justify legislative changes to impose new barriers to exercising the franchise.  In recently disclosed emails between Kobach and the Trump transition team on November 9 and 10, 2016, Kobach indicated he was working with other advisors on "legislation drafts for submission to Congress early in the administration," and that he had already started drafting "amendments to the NVRA [National Voter Registration Act of 1993] to make clear that proof of citizenship requirements are permitted."[8]

14.     On June 28, 2017, Kobach sent letters to chief state election officials requesting that they submit "publicly-available voter roll data" and feedback on how to improve election integrity by July 14, 2017.  The requested voter roll data included:

    a. the full first and last names of all registrants, middle names or initials if available,

    b. addresses,

    c. dates of birth,

    d. political party (if recorded),

    e. last four digits of social security number if available,

    f. voter history (elections voted in) from 2006 onward,

    g. active/inactive status, cancelled status,

---

[7] Curt Mills, *Trump Calls for Voter Fraud Investigation*, US NEWS, Jan. 25, 2017, *available at* https://www.usnews.com/news/politics/articles/2017-01-25/donald-trump-tweets-call-for-major-investigation-into-voter-fraud.

[8] Christopher Ingraham, *Vice Chair of Trump's Voter Fraud Commission Wants to Change Federal Law to Add New Requirements for Voting, Email Shows*, WASHINGTON POST, July 17, 2017, *available at* https://www.washingtonpost.com/news/wonk/wp/2017/07/17/vice-chair-of-trumps-voter-fraud-commission-wants-to-change-federal-law-to-make-it-harder-to-vote-email-shows/?utm_term=.77d87d87f27d.

h. information regarding any felony convictions,

i. information regarding voter registration in another state,

j. information regarding military status, and

k. overseas citizen information.

Kobach also asked state election officials to provide, among other things, recommendations regarding changes to federal election laws that would enhance the integrity of federal elections, information regarding instances of voter fraud or registration fraud, and information regarding convictions for election-related crimes since the November 2000 federal election.

15.     In his June 28, 2017, letter requests, Kobach stated that "any documents that are submitted to the full Commission will also be made available to the public," although Kobach has since represented that this statement applies only to "narrative responses" submitted by states to the Commission and that voter roll data will be de-identified prior to any public release of documents.

16.     A first meeting of the Commission was held on July 19, 2017.  President Trump attended and spoke at that meeting.  During his statements, Trump stressed that "voter fraud," including "[a]ny form of illegal or fraudulent voting, whether by non-citizens or the deceased," was something that his administration "can't let . . . happen."  He also suggested that states that are unwilling to share the voter roll information requested by Kobach are "worried about" having "something" to hide.[9]

17.     On July 26, 2017, Kobach sent letters to chief state election officials renewing his request for voter roll data and feedback on the federal election process.

_____

[9] Pam Fessler & Brett Nelly, *Talk of Voter Fraud Dominates First Meeting of Election Integrity Commission*, NPR, July 18, 2017, *available at* http://www.npr.org/2017/07/19/538152713/talk-of-voter-fraud-dominates-first-meeting-of-election-integrity-commission.

18.     The Commission's next meeting is scheduled for September 12, 2017.[10]

19.     The Commission's actions have already had a chilling effect on voter registration. For example, nearly 4,000 people in Colorado canceled their voter registrations after Kobach issued his requests for state voter roll data.[11] Similarly, over 1,715 Florida voters cancelled their voter registrations in the twenty-day period after Kobach requested state voter roll data, a 117 percent increase in cancellations over the same period in the prior year.[12] Multiple election officials have said that the volume of registration cancellations in response to Kobach's requests is unprecedented. Far from demonstrating evidence of voter fraud, on information and belief, such cancellations suggest that many eligible voters are deeply concerned that their personal information may be shared or disclosed publicly by the Commission.

20.     The Commission's actions have also raised questions about its ability to adequately protect the privacy of voters. For example, on July 14, 2017, the Commission published to the general public comments and feedback it had received at a Commission email address without redacting commenters' names or, in many instances, other personal information, including email addresses.[13] This unanticipated, wide release of personal information demonstrates the need for the public to have more information about the Commission's methods

---

[10] Kevin Landigran, *Gardner invites chief panel critic to voter commission meeting in NH*, N.H. Union Leader, Aug. 26, 2017, *available at* http://www.unionleader.com/politics/Gardner-invites-chief-panel-critic-to-voter-commission-meeting-in-NH-08272017.

[11] Aidan Quigley, *Trump Voter Fraud Probe Sparks Wave of Canceled Registrations in Colorado*, NEWSWEEK, July 17, 2017, *available at* http://www.newsweek.com/thousands-colorado-democrats-and-independents-cancel-voter-registration-after-637996.

[12] Asa Royal, *Florida Voters Cancel Their Own Registration. Is Trump's Fraud Commission the Cause?*, TAMPA BAY TIMES, Aug. 15, 2017, *available at* http://www.tampabay.com/news/florida-voters-cancel-their-own-registration-is-trumps-fraud-commission/2332036.

[13] Scott Neuman, *Vote Fraud Commission Releases Public Comments, Email Addresses and All*, NPR, July 14, 2017, *available at* http://www.npr.org/sections/thetwo-way/2017/07/14/537282309/vote-fraud-commission-releases-public-comments-email-addresses-and-all.

for collecting, protecting, and disclosing voter roll data and other information about the federal election process.

21.    Neither the President nor any executive branch official has publicly released any legal analysis, memorandum, or other written record of how the Commission will identify practices that enhance or undermine confidence in federal elections or investigate vulnerabilities in voting systems used for federal elections.  Moreover, the Commission has failed to make timely court-ordered disclosures in litigation pending before the District Court for the District of Columbia.[14]

22.    In order for Congress and state and local elected officials to exercise their roles as representatives of the people, the people must be able to provide their representatives with their views.  The public cannot do this in an informed way about an issue as critically important as their right to vote in the absence of information from Defendant agencies about the Commission.

23.    The Commission and the issue of voter fraud have been the focus of widespread and extensive public interest and media coverage, reflecting the public's urgent concern about election integrity, data privacy, and whether the Commission is pursuing an illegitimate or pre-determined agenda for purposes of voter suppression.

24.    Because the Commission is proceeding with its effort to collect state voter roll data, and because other actions by the Commission that may lead to increased voter disenfranchisement or voter suppression may also be imminent, it is imperative that the public be informed immediately of the Commission's intentions and processes in order for the public to

---

[14] Josh Gerstein, *Trump election fraud panel apologizes in document disclosure flap*, POLITICO, Aug. 30, 2017 (discussing *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 17-cv-1320 (D.D.C. filed July 3, 2017)), *available at* http://www.politico.com/story/2017/08/30/trump-election-fraud-panel-apologizes-242173.

formulate and communicate their views to state officials, Congress, and President Trump's Commission.

25.     Plaintiffs intend to share any documents transmitted via FOIA with the public (subject to any and all appropriate redactions of personal information), and to provide information and analysis about those documents as appropriate.

**B. Plaintiffs' FOIA Requests and Defendants' Responses**

26.     As detailed below, Plaintiffs submitted a total of eight FOIA requests to Defendants—two requests to each of the four Defendants.

*i.     DOJ Office of Information Policy and Office of Legal Counsel*

27.     On May 15, 2017, Plaintiffs sent a FOIA request to Defendant DOJ, and specifically to the Office of Information Policy and Office of Legal Counsel.

28.     On information and belief, Defendant DOJ – and the Office of Information Policy and Office of Legal Counsel, specifically – has documents related to the Commission, including documents related to the reasons for forming the Commission, the goals and mission of the Commission, and the Commission's intended activities. This belief is based upon statements made by Kobach indicating that he would seek "information" from DOJ regarding issues related to voter fraud,[15] statements given at the Commission's first meeting stating that it intends to "find out from the U.S. attorneys' offices all across the country whether they are complying with" the National Voter Registration Act and to seek information regarding whether US attorneys' office are sharing data with states regarding convictions that might disqualify

---

[15] Dave Boyer, *Voter Fraud and Suppression Commission to Meet in July*, WASHINGTON TIMES, June 27, 2017, *available at* http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-commission.

individuals from voting, and statements from senior White House officials indicating that DOJ

would be "looking . . . very seriously and very hard" at issues of voter fraud.[16]

29.     Plaintiffs' May 15, 2017, FOIA request to DOJ sought the following records:

1.     All communications, including but not limited to emails and
memoranda, between any Department of Justice ("DOJ" or "Department")
officer, employee, or agent, or any White House liaison to the Department,
and any other person, including but not limited to any officer, employee,
or agent of the White House or DOJ, or any member of the presidential
transition team or the presidential campaign of Donald Trump, regarding
the Presidential Advisory Commission on Election Integrity or any other
effort since November 8, 2016 to establish a commission, task force, or
committee to study voter fraud or any aspect of the voting system.

2.     All communications, including but not limited to emails and
memoranda, between any Department officer, employee, or agent, or any
White House liaison to the Department, and any member of the
Presidential Advisory Commission on Election Integrity, other than Vice
President Michael Pence, since November 8, 2016.

3.     All documents relating to the Presidential Advisory Commission
on Election Integrity or any other effort since November 8, 2016 to
establish a commission, task force, or committee to study voter fraud or
any aspect of the voting system, including all documents discussing or
making reference to the following subjects:

a)     The Executive Order creating the Presidential Advisory
Commission on Election Integrity;

b)     The reasons for forming the Presidential Advisory
Commission on Election Integrity;

c)     The goals and mission of the Presidential Advisory
Commission on Election Integrity; and

d)     The membership of the Presidential Advisory Commission
on Election Integrity, including the criteria for selection of
its members.

---

[16] Glenn Kessler, *Stephen Miller's Bushels of Pinocchios for False Voter-Fraud Claims*, WASHINGTON
POST, Feb. 12, 2017, *available at* https://www.washingtonpost.com/news/fact-
checker/wp/2017/02/12/stephen-millers-bushels-of-pinocchios-for-false-voter-fraud-
claims/?utm_term=.1e53ead71b5e.

30.     Plaintiffs also requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e).

31.     Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. § 16.10(k).

32.     On May 25, 2017, the DOJ Office of Information Policy acknowledged receipt of the request on May 15, 2017, and assigned it four case reference numbers (DOJ-2017-004083, -004291, -004292, -004293).  In this letter, the Office of Information Policy denied the request to expedite under the standard involving "urgency to inform the public about an actual or alleged federal government activity," 28 C.F.R. § 16.5(e)(1)(ii).  The letter further stated that it would make a decision on the fee waiver after determining whether fees would be assessed for the request.  In an August 2, 2017, letter, the Office of Information Policy denied the request to expedite under the standard involving a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 28 C.F.R. § 16.5(e)(1)(iv).

33.     On June 8, 2017, the DOJ Office of Legal Counsel acknowledged receipt of the request on May 15, 2017, and assigned it a case reference number (FY17-218).  The DOJ Office of Legal Counsel granted the request for expedited processing, but indicated that it had not yet initiated process and stated that, because of the considerable number of FOIA requests received, it was "likely that we will be unable to respond to the request within the twenty-day statutory deadline."  The DOJ Office of Legal Counsel further stated that it would make a decision on the request for a fee waiver after determining whether fees would be assessed for the request.

34.     On July 25, 2017, Plaintiffs sent a second FOIA request to Defendant DOJ, and

specifically, the Office of Information Policy, Office of Legal Counsel, and Civil Rights

Division.

35.     Plaintiffs' July 25, 2017, FOIA request to DOJ sought the following records:

1.     All communications and documents subject to the Initial FOIA Request
created, dated, identified, or modified subsequent to any search previously
undertaken by DOJ, CRD, OLC, or OIP in response to the Initial Request.

2.     All communications and documents regarding use of the following
databases for any purpose related to the Presidential Advisory Commission on
Election Integrity, whether by any employee of DHS or by any commissioner,
officer, agent, employee, or assignee of the Presidential Advisory Commission on
Election Integrity:

a.     The Systematic Alien Verification for Entitlements ("SAVE")
program;

b.     The National Security Entry-Exit Registration Systems
("NSEERS") program;

c. Any cross-state voter database programs, including but not limited to
the Electronic Registration Information Center ("ERIC") and Interstate
Voter Registration Crosscheck ("IVRC") program;

d.     Any list, program, or other resource that contains or can be used to
determine the citizenship status of any individual, including but not
limited to resources at the disposal of the Executive Office for
Immigration Review ("EOIR");

e. Any other federal database for the purpose of matching, verifying, or
investigating information on voter registration lists, including all lists to
which the Commission was granted access.

3. All communications and documents concerning the Presidential Advisory
Commission on Election Integrity, including but not limited to emails,
memoranda, and letters to state election officials regarding the requests for
narrative responses and voter file data sent by the Commission on or around June
28, 2017.

4.     All communications and documents identifying the names and titles of
DOJ officers, agents, employees, or assignees on detail or assignment to the
Commission, the Executive Office of the President ("EOP"), or other agency or

government entity to work with or on behalf of the Commission, including but not limited to memoranda of understanding with the Commission, EOP, or other agency or government entity outlining such individuals' responsibilities while on detail or assignment.

5.    All communications and documents regarding the selection of members of the Commission, including but not limited to selection criteria.

6.    All communications and documents regarding the staffing of the Commission, including but not limited to job descriptions, organization charts, and criteria for hiring.

7.    All communications and documents regarding DOJ expenditures directly or indirectly related to the Commission and Commission activities.

8.    All communications and documents regarding the Commission's July 19, 2017 meeting, including but not limited to communications and documents concerning the meeting agenda, staffing, location, and budget and any notes or transcripts of the meeting proceedings.

9.    All communications and documents concerning the Commission's research or investigatory activities, including but not limited to communications and documents concerning the Commission's research methodologies, identification of experts, consultation with experts, and materials reviewed in connection with the Commission's research and investigatory activities.

10.   All communications and documents describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched, and any tracking sheets used to track the processing of this request. If DOJ uses FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches, we also request any such records prepared in connection with the processing of this request.

36.    Plaintiffs also requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e).

37.    Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. § 16.10(k).

38.    On August 3, 2017, the DOJ Office of Information Policy acknowledged receipt of the second request on July 25, 2017, and assigned it five case reference numbers (DOJ-2017-

005582, -005734, -005735, -005736, -005737).  In this letter, the Office of Information Policy denied the request to expedite under the standard involving "urgency to inform the public about an actual or alleged federal government activity," 28 C.F.R. § 16.5(e)(1)(ii).  The letter further stated that it would direct to DOJ's Director of Public Affairs the request to expedite under the standard involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv).  Additionally, the letter stated that it would decide the request for fee waiver after determining whether fees would be assessed for the request.  The letter also stated the July 25, 2017, request falls within "unusual circumstances," and that the DOJ would need to extend its time to response beyond the ten additional days provided by FOIA.  *See* 5 U.S.C. 552 § (a)(6)(B)(i)-(iii),

39.     Pursuant to FOIA, Defendant DOJ was required to "determine . . . whether to comply with such request" and to "immediately notify" Plaintiffs of "such determination and the reasons therefor," Plaintiffs' right "to seek assistance from the FOIA Public Liaison of the agency," and, in the case of an adverse determination, Plaintiffs' appeal rights, within 20 business days of receipt of the May 15, 2017, FOIA requests – no later than June 13, 2017 – and within 30 days of receipt of the July 25, 2017, FOIA request – no later than September 6, 2017. 5 U.S.C. § 552(a)(6)(A)(i), (ii) & (B)(i).

40.     To date, Defendant DOJ has failed to make the required determinations and notifications.

> *ii.    DHS*

41.     On May 17, 2017, Plaintiffs sent a FOIA request to Defendant DHS.

42.     On information and belief, Defendant DHS has documents related to the Commission, including documents related to the reasons for forming the Commission, the goals and mission of the Commission, and the Commission's intended activities.  This belief is based upon statements made by Kobach indicating his belief that DHS has "data" regarding issues related to voter fraud,[17] representations from both Kobach and a spokesman for Vice President Pence that the Commission intends to "check" the voter roll information it has requested "against the federal government's database of non-citizens" (*i.e.* against information maintained by DHS),[18] and statements from members at the Commission's first meeting that the Commission intends to collect "helpful" data already in the possession of the federal government, including from DHS databases.  Prior to the Commission's creation, Kobach also stated that it would have a "full-time staff" from DHS,[19] and was photographed holding documents emblazoned with the title "Department of Homeland Security."[20]

43.     Plaintiffs' May 17, 2017, FOIA request to DHS sought the following records:

> 1.     All communications, including but not limited to emails and memoranda, between any Department of Homeland Security ("DHS" or "Department") officer, employee, or agent, or any White House liaison to DHS, and any other person, including but not limited to any officer, employee, or agent of the White House or DHS, or any member of the presidential transition team or the presidential campaign of Donald Trump, regarding the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to establish a commission, task

---

[17] Dave Boyer, *Voter Fraud and Suppression Commission to Meet in July*, WASHINGTON TIMES, June 27, 2017, *available at* http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-commission-to-meet-in-/.

[18] Jessica Huseman, *Election Experts See Flaws in Trump Voter Commission's Plan to Smoke Out Fraud*, PROPUBLICA, July 6, 2017, *available at* https://www.propublica.org/article/election-experts-see-flaws-in-trump-voter-commissions-plan-to-smoke-out-fraud.

[19] Katy Bergen & Bryan Lowry, *Kobach Says He Turned Down White House Job*, KANSAS CITY STAR, June 8, 2017, *available at* http://www.kansascity.com/news/politics-government/article155170989.html.

[20] Caroline Kenny, *Photo of Trump-Kobach Meeting Reveals Apparent DHS Proposal*, CNN, Nov. 21, 2016, *available at* http://www.cnn.com/2016/11/21/politics/kris-kobach-donald-trump-department-of-homeland-security/index.html.

force, or committee to study voter fraud or any aspect of the voting system.

2.      All communications, including but not limited to emails and memoranda, between any DHS officer, employee, or agent, or any White House liaison to DHS, and any member of the Presidential Advisory Commission on Election Integrity, other than Vice President Michael Pence, since November 8, 2016.

3.      All documents relating to the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to establish a commission, task force, or committee to study voter fraud or any aspect of the voting system, including all documents discussing or making reference to the following subjects:

      a)      The Executive Order creating the Presidential Advisory Commission on Election Integrity;

      b)      The reasons for forming the Presidential Advisory Commission on Election Integrity;

      c)      The goals and mission of the Presidential Advisory Commission on Election Integrity;

      d)      The membership of the Presidential Advisory Commission on Election Integrity, including the criteria for selection of its members; and

      e)      The staffing of the Presidential Advisory Commission on Election Integrity, including job descriptions, organization charts, and criteria for hiring.

44.      Plaintiffs also requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R.§ 5.5(e).

45.      Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 6 C.F.R. § 5.11.

46.      On May 19, 2017, Defendant DHS acknowledged receipt of the request on May 17, 2017, and assigned it a case reference number (2017-HQFO-00794).  In its letter, DHS granted Plaintiffs' request for expedited processing and fee waiver, but also indicated  that it had not yet initiated processing and claimed unusual circumstances – that the request "seeks

documents that will require a thorough and wide-ranging search" – such that it would need an additional 10 days to make a determination.

47.     On July 25, 2017, Plaintiffs sent a second FOIA request to Defendant DHS.

48.     Plaintiffs' July 25, 2017, FOIA request to DHS sought the following records:

1.      All communications and documents subject to the Initial FOIA Request, reference number 2017-HQFO-00794, created, dated, identified, or modified subsequent to any search previously undertaken by DHS in response to the Initial Request.

2.      All communications and documents regarding use of the following databases for any purpose related to the Presidential Advisory Commission on Election Integrity, whether by any employee of DHS or by any commissioner, officer, agent, employee, or assignee of the Presidential Advisory Commission on Election Integrity:

    a.      The Systematic Alien Verification for Entitlements ("SAVE") program;

    b.      The National Security Entry-Exit Registration Systems ("NSEERS") program;

    c.      Any cross-state voter database programs, including but not limited to the Electronic Registration Information Center ("ERIC") and Interstate Voter Registration Crosscheck ("IVRC") program;

    d.      Any list, program, or other resource that contains or can be used to determine the citizenship status of any individual;

    e.      Any other federal database for the purpose of matching, verifying, or investigating information on voter registration lists, including all lists to which the Commission was granted access.

3.      All communications and documents concerning the Presidential Advisory Commission on Election Integrity, including but not limited to emails, memoranda, and letters to state election officials regarding the requests for narrative responses and voter file data sent by the Commission on or around June 28, 2017.

4.      All communications and documents identifying the names and titles of DHS officers, agents, employees, or assignees on detail or assignment to the Commission, the Executive Office of the President ("EOP"), or other agency or government entity to work with or on behalf of the Commission, including but not

limited to memoranda of understanding with the Commission, EOP, or other
agency or government entity outlining such individuals' responsibilities while on
detail or assignment.

5.      All communications and documents regarding the selection of members of
the Commission, including but not limited to selection criteria.

6.      All communications and documents regarding the staffing of the
Commission, including but not limited to job descriptions, organization charts,
and criteria for hiring.

7.      All communications and documents regarding DHS expenditures directly
or indirectly related to the Commission and Commission activities.

8.      All communications and documents regarding the Commission's July 19,
2017 meeting, including but not limited to communications and documents
concerning the meeting agenda, staffing, location, and budget and any notes or
transcripts of the meeting proceedings.

9.      All communications and documents concerning the Commission's
research or investigatory activities, including but not limited to communications
and documents concerning the Commission's research methodologies,
identification of experts, consultation with experts, and materials reviewed in
connection with the Commission's research and investigatory activities.

10.     All communications and documents describing the processing of this
request, including records sufficient to identify search terms used and locations
and custodians searched, and any tracking sheets used to track the processing of
this request. If DHS uses FOIA questionnaires or certifications completed by
individual custodians or components to determine whether they possess
responsive materials or to describe how they conducted searches, we also request
any such records prepared in connection with the processing of this request.

49.     Plaintiffs requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and

6 C.F.R. § 5.5(e).

50.     Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5

U.S.C. § 552(a)(4)(A)(iii), and 6 C.F.R. § 5.11(k).

51.     On July 28, 2017, DHS acknowledged receipt of the second request on July 26,

2017, and assigned it case reference number 2017-HQFO-01111.  In this letter, DHS denied the

request to expedite, stating that the request did not qualify under any category of 6 C.F.R. Part 5

§ 5.5(e)(1), and specifically, that the request was "conclusory in nature and did not present any facts to justify a grant of expedited processing." The letter further stated that DHS would "conditionally grant" the fee waiver request. The letter also stated the July 25, 2017, request falls within "unusual circumstances," and that the DHS would need to extend its time to response beyond the ten additional days provided by FOIA. *See* 5 U.S.C. 552 § (a)(6)(B)(i)-(iii),

52.     In a separate letter dated August 7, 2017, DHS acknowledged receipt of the second request on August 2, 2017, and assigned it case reference number 2017-HFQO-01158. DHS granted the request for expedited processing and fee waiver, and invoked the 10-day extension for unusual circumstances.

53.     Pursuant to FOIA, within 30 business days of receipt of Plaintiffs' requests – that is, by June 28, 2017, for the first request and September 7, 2017, for the second request – DHS was required to "determine . . . whether to comply with such request" and to "immediately notify" Plaintiffs of "such determination and the reasons therefor," Plaintiffs' right "to seek assistance from the FOIA Public Liaison of the agency," and, in the case of an adverse determination, Plaintiffs' appeal rights. 5 U.S.C. § 552(a)(6)(A)(i) & (B)(i).

54.     To date, Defendant DHS has failed to make the required determinations and notifications.

      *iii.     GSA*

55.     On May 17, 2017, Plaintiffs sent a FOIA request to Defendant GSA.

56.     On information and belief, Defendant GSA has documents related to the Commission, including documents related to the reasons for forming the Commission, the goals and mission of the Commission, and the Commission's intended activities. The belief is based, among other things, upon President Trump's Executive Order, which provides that "the General

Services Administration shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis."

57.     Plaintiff's FOIA request sought the following records:

1.     All communications, including but not limited to emails and memoranda, within the custody or control of GSA regarding the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to establish a commission, task force, or committee to study voter fraud or any aspect of the voting system.

2.     All communications, including but not limited to emails and memoranda, within the custody or control of GSA with any member of the Presidential Advisory Commission on Election Integrity, other than Vice President Michael Pence, since November 8, 2016.

3.     All documents relating to the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to establish a commission, task force, or committee to study voter fraud or any aspect of the voting system, including all documents discussing or making reference to the following subjects:

     a)    The Executive Order creating the Presidential Advisory Commission on Election Integrity;

     b)    The reasons for forming the Presidential Advisory Commission on Election Integrity;

     c)    The goals and mission of the Presidential Advisory Commission on Election Integrity;

     d)    The membership of the Presidential Advisory Commission on Election Integrity, including the criteria for selection of its members;

     e)    The budget of the Presidential Advisory Commission on Election Integrity; and

     f)    The staffing of the Presidential Advisory Commission on Election Integrity, including job descriptions, organization charts, and criteria for hiring.

58.     Plaintiffs also requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 41 C.F.R. § 105-60.402-2(c).

59.     Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 41 C.F.R. § 105-60.305-13.

60.     On May 17, 2017, Defendant GSA acknowledged receipt of the request on May 17, 2017, and assigning it a case reference number GSA-2017-001031.

61.     By letter dated July 6, 2017, GSA responded to the request. GSA indicated that it was unable to locate any responsive records within the custody or control of GSA "regarding the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016, through May 10, 2017." GSA further contended that pursuant to the May 11, 2017, Executive Order establishing the Commission, GSA records pertaining to the Commission "are maintained pursuant to the Presidential Records Act (44 U.S.C. Chapter 22) and are not releasable."

62.     On August 7, 2017, Plaintiffs appealed GSA's response pursuant to 5 U.S.C. § 552(a)(6)(ii) and 41 C.F.R. § 105-60.403, asserting GSA had conducted an inadequate search for responsive records and had improperly described its agency disclosure obligations.

63.     By letter dated August 9, 2017, GSA acknowledged receipt of Plaintiffs' appeal on August 9, 2017.

64.     Pursuant to FOIA, GSA was required to make a determination of Plaintiffs' appeal within 20 business days of receipt of Plaintiffs' appeal – that is, by September 7, 2017. 5 U.S.C. §§ 552(a)(6)(A)(ii).

65.     To date, Defendant GSA has failed to make the required determinations and notifications.

66.     On July 25, 2017, Plaintiffs sent a second FOIA request to GSA, which sought the

following records:

> 1.      All communications and documents subject to the Initial FOIA Request
> created, dated, identified, or modified subsequent to any search previously
> undertaken by GSA in response to the Initial Request.
>
> 2.      All communications and documents regarding use of the following
> databases for any purpose related to the Presidential Advisory Commission on
> Election Integrity, whether by any employee of DHS or by any commissioner,
> officer, agent, employee, or assignee of the Presidential Advisory Commission on
> Election Integrity:
>
>> a.      The Systematic Alien Verification for Entitlements ("SAVE")
>> program;
>>
>> b.      The National Security Entry-Exit Registration Systems
>> ("NSEERS") program;
>>
>> c.      Any cross-state voter database programs, including but not limited
>> to the Electronic Registration Information Center ("ERIC") and Interstate
>> Voter Registration Crosscheck ("IVRC") program;
>>
>> d.      Any list, program, or other resource that contains or can be used to
>> determine the citizenship status of any individual;
>>
>> e.      Any other federal database for the purpose of matching, verifying,
>> or investigating information on voter registration lists, including all lists to
>> which the Commission was granted access.
>
> 3.      All communications and documents concerning the Presidential Advisory
> Commission on Election Integrity, including but not limited to emails,
> memoranda, and letters to state election officials regarding the requests for
> narrative responses and voter file data sent by the Commission on or around June
> 28, 2017.
>
> 4.      All communications and documents identifying the names and titles of
> DHS officers, agents, employees, or assignees on detail or assignment to the
> Commission, the Executive Office of the President ("EOP"), or other agency or
> government entity to work with or on behalf of the Commission, including but not
> limited to memoranda of understanding with the Commission, EOP, or other
> agency or government entity outlining such individuals' responsibilities while on
> detail or assignment.

5.     All communications and documents regarding the selection of members of the Commission, including but not limited to selection criteria.

6.     All communications and documents regarding the staffing of the Commission, including but not limited to job descriptions, organization charts, and criteria for hiring.

7.     All communications and documents regarding GSA expenditures directly or indirectly related to the Commission and Commission activities.

8.     All communications and documents regarding expenditures by any other federal agency directly or indirectly related to the Commission and Commission activities.

9.     All communications and documents regarding the Commission's July 19, 2017 meeting, including but not limited to communications and documents concerning the meeting agenda, staffing, location, and budget and any notes or transcripts of the meeting proceedings.

10.    All communications and documents concerning the Commission's research or investigatory activities, including but not limited to communications and documents concerning the Commission's research methodologies, identification of experts, consultation with experts, and materials reviewed in connection with the Commission's research and investigatory activities.

11.    All communications and documents describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched, and any tracking sheets used to track the processing of this request. If GSA uses FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches, we also request any such records prepared in connection with the processing of this request.

67.    Plaintiffs requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 41 C.F.R. § 105-60.402-2(c)(2).

68.    Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 41 C.F.R. § 105-60.305-13.

69.    On July 27, 2017, GSA acknowledged receipt of the second request on July 27, 2017, and assigned it case reference number GSA-2017-001401.  In subsequent emails, GSA granted Plaintiffs' request for expedited processing and fee waiver.

70.     Pursuant to FOIA, within 20 business days of receipt of Plaintiffs' second request – that is, by August 24, 2017 – GSA was required to "determine . . . whether to comply with such request" and to "immediately notify" Plaintiffs of "such determination and the reasons therefor," Plaintiffs' right "to seek assistance from the FOIA Public Liaison of the agency," and, in the case of an adverse determination, Plaintiffs' appeal rights.  5 U.S.C. § 552(a)(6)(A)(i) & (B)(i).

71.     To date, Defendant GSA has failed to make the required determination and notification.

      *iv.*   *OMB*

72.     On May 17, 2017, Plaintiffs sent a FOIA request to Defendant OMB.

73.     On information and belief, Defendant OMB has documents related to the Commission, including documents related to the reasons for forming the Commission, the goals and mission of the Commission, and the Commission's intended activities.  Among other things, agencies are statutorily required to request approval from OMB's Office of Information and Regulatory Affairs regarding information collection requests, like that issued from the Commission to the state election officials.  The OMB is also generally responsible for assisting the President in overseeing the "implementation of his vision across the Executive Branch,"[21] which, upon information and belief, would include providing assistance to or coordinating with the Commission.

74.     Plaintiffs' May 17, 2017, FOIA request to OMB sought the following records:

> 1.     All communications, including but not limited to emails and memoranda, within the custody or control of OMB regarding the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to

---

[21] The White House, Office of Management and Budget, https://www.whitehouse.gov/omb (last visited Aug. 15, 2017).

establish a commission, task force, or committee to study voter fraud or any aspect of the voting system.

2.     All communications, including but not limited to emails and memoranda, within the custody or control of OMB with any member of the Presidential Advisory Commission on Election Integrity, other than Vice President Michael Pence, since November 8, 2016.

3.     All documents relating to the Presidential Advisory Commission on Election Integrity or any other effort since November 8, 2016 to establish a commission, task force, or committee to study voter fraud or any aspect of the voting system, including all documents discussing or making reference to the following subjects:

   a)   The Executive Order creating the Presidential Advisory Commission on Election Integrity;
   b)   The reasons for forming the Presidential Advisory Commission on Election Integrity;
   c)   The goals and mission of the Presidential Advisory Commission on Election Integrity;
   d)   The membership of the Presidential Advisory Commission on Election Integrity, including the criteria for selection of its members;
   e)   The budget of the Presidential Advisory Commission on Election Integrity, including line items for salaries, research, travel, meetings, hearings, and public materials; and
   f)   The staffing of the Presidential Advisory Commission on Election Integrity, including job descriptions, organization charts, and criteria for hiring.

75.     Plaintiffs also requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e).

76.     Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. § 16.10(k).

77.     On May 18, 2017, Defendant OMB acknowledged receipt of the request on May 18, 2017, and assigned it a case reference number (2017-231).  OMB did not respond to the request for expedited processing or for a fee waiver.

78.     On July 25, 2017, Plaintiffs sent a second FOIA request to OMB, which sought

the following records:

1.      All communications and documents subject to the Initial FOIA Request, reference number 2017-231, created, dated, identified, or modified subsequent to any search previously undertaken by OMB in response to the Initial Request.

2.      All communications and documents regarding use of the following databases for any purpose related to the Presidential Advisory Commission on Election Integrity, whether by any employee of DHS [sic] or by any commissioner, officer, agent, employee, or assignee of the Presidential Advisory Commission on Election Integrity:

    a.      The Systematic Alien Verification for Entitlements ("SAVE") program;

    b.      The National Security Entry-Exit Registration Systems ("NSEERS") program;

    c.      Any cross-state voter database programs, including but not limited to the Electronic Registration Information Center ("ERIC") and Interstate Voter Registration Crosscheck ("IVRC") program;

    d.      Any list, program, or other resource that contains or can be used to determine the citizenship status of any individual;

    e.      Any other federal database for the purpose of matching, verifying, or investigating information on voter registration lists, including all lists to which the Commission was granted access.

3.      All communications and documents concerning the Presidential Advisory Commission on Election Integrity, including but not limited to emails, memoranda, and letters to state election officials regarding the requests for narrative responses and voter file data sent by the Commission on or around June 28, 2017.

4.      All communications and documents concerning the application of the Paperwork Reduction Act to the correspondence sent by the Presidential Advisory Commission on Election Integrity to state election officials on our around June 28, 2017.

5.      All communications and documents identifying the names and titles of OMB officers, agents, employees, or assignees on detail or assignment to the Commission, the Executive Office of the President ("EOP"), or other agency or government entity to work with or on behalf of the Commission, including but not

limited to memoranda of understanding with the Commission, EOP, or other agency or government entity outlining such individuals' responsibilities while on detail or assignment.

5.      All communications and documents regarding the selection of members of the Commission, including but not limited to selection criteria.

6.      All communications and documents regarding the staffing of the Commission, including but not limited to job descriptions, organization charts, and criteria for hiring.

7.      All communications and documents regarding OMB expenditures directly or indirectly related to the Commission and Commission activities.

8.      All communications and documents regarding expenditures by any other federal agency directly or indirectly related to the Commission and Commission activities.

9.      All communications and documents regarding the Commission's July 19, 2017 meeting, including but not limited to communications and documents concerning the meeting agenda, staffing, location, and budget and any notes or transcripts of the meeting proceedings.

10.     All communications and documents describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched, and any tracking sheets used to track the processing of this request. If OMB uses FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches, we also request any such records prepared in connection with the processing of this request.

79.     Plaintiffs requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 5 C.F.R. § 1303.10(d).

80.     Plaintiffs also requested fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II), 5 U.S.C. § 552(a)(4)(A)(iii), and 5 C.F.R. § 1303.70.

81.     On July 27, 2017, Defendant OMB acknowledged receipt of the request on July 27, 2017, and assigned it a case reference number (2017-342).  OMB did not respond to the request for expedited processing or for a fee waiver.

82.     Pursuant to FOIA, within 20 business days of receipt of Plaintiffs' requests – that is, by June 16, 2017, for the first request and August 24, 2017, for the second request – OMB was required to "determine . . . whether to comply with such request" and to "immediately notify" Plaintiffs of "such determination and the reasons therefor," Plaintiffs' right "to seek assistance from the FOIA Public Liaison of the agency," and, in the case of an adverse determination, Plaintiffs' appeal rights.  5 U.S.C. § 552(a)(6)(A)(i).

83.     To date, Defendant OMB has failed to make the required determination and notifications.

### COUNT I

84.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 83 as if fully set forth herein.

85.     Defendants are in violation of FOIA by failing to respond to Plaintiffs' requests within the statutorily prescribed time limit and by unlawfully withholding records responsive to Plaintiffs' requests.

### COUNT II

86.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 85 as if fully set forth herein.

87.     Defendants DOJ and OMB are in violation of FOIA by failing to grant expedited processing to Plaintiff under 5 U.S.C. § 552(a)(6)(E).

### REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)     Order Defendants, by a date certain, to conduct a search that is reasonably likely to lead to the discovery of any and all records responsive to Plaintiffs' requests;

(2)     Order Defendants, by a date certain, to disclose all non-exempt records responsive to Plaintiffs' FOIA requests, as a well as a *Vaughn* index of any records or portions of records withheld due to a claim of exemption;

(3)     Order Defendants to grant Plaintiffs' requests for a fee waiver;

(4)     Order Defendants DOJ and OMB to grant Plaintiffs' request for expedited processing of its request;

(5)     Award Plaintiffs their costs and reasonable attorney fees incurred in this action; and

(6)     Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

Date:   September 11, 2017

/s/

Jeremy M. Creelan
David W. Sussman
Emily S. Deininger
Justin O. Spiegel
Derek Stegelmeier
Carl N. Wedoff
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
Phone: (212) 891-1600
jcreelan@jenner.com
dsussman@jenner.com
edeininger@jenner.com
jspiegel@jenner.com
dstegelmeier@jenner.com
cwedoff@jenner.com

Laurence Schwartztol
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
Phone: (202) 599-0466
larry.schwartztol@protectdemocracy.org

Wendy R. Weiser
BRENNAN CENTER FOR JUSTICE
  at New York University
  School of Law
161 Avenue of the Americas
New York, New York 10013
Phone: (646) 292-8335
weiserw@brennan.law.nyu.edu

*Counsel for Plaintiffs*