**919 THIRD AVENUE  NEW YORK  NEW YORK  10022-3908**

JENNER&BLOCK LLP

Jeremy M. Creelan
Tel  212 891-1678
jcreelan@jenner.com

December 29, 2017

**VIA ECF**

Honorable Katherine B. Forrest
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:    ***Brennan Center for Justice, et al. v. Dep't of Justice, et al., No. 17-cv-6335 (KBF)***

Dear Judge Forrest:

We submit this letter reply ("Reply") on behalf of our clients, Plaintiffs Brennan Center for Justice at New York University School of Law ("Brennan Center") and The Protect Democracy Project ("Protect Democracy") (collectively, "Plaintiffs"), in response to Defendants'[1] December 22, 2017 letter to the Court ("Opposition").  Dkt. No. 37.  The need for a preliminary injunction ordering Defendants to complete their production by February 28, 2018 is demonstrated by Defendants' proposed production deadlines—March 31, 2018 for DOJ-OLC and DOJ-OIP and July 31, 2018 for DHS—as this timetable would moot the relief requested in this lawsuit and contravene FOIA's mandate to make records promptly available.

The Commission's activities concern the backbone of democracy: the right of every eligible citizen to make their voice heard through voting.  The records Plaintiffs request are necessary to subject the Commission's processes and activities to public scrutiny.  A February 28, 2018 deadline is the absolute latest production date that would afford Plaintiffs meaningful relief in this suit and avoid irreparable harm, and given the modest volume of records at issue, is an eminently practicable deadline for the Defendants.

> **I.    Plaintiffs Will Suffer Irreparable Harm if the Court Does Not Compel Production by February 28, 2018.**

As set forth in Plaintiffs' previous submissions to the Court, *see* Dkt. Nos. 24, 25, 33, the production schedules proposed by Defendants—particularly DHS, which asks to complete

---

[1] In this Reply, "Defendants" means the Department of Justice ("DOJ") Office of Legal Counsel ("DOJ-OLC"), DOJ Office of Information Policy ("DOJ-OIP"), and Department of Homeland Security ("DHS").  Plaintiffs agree to the production schedule proposed by the DOJ Civil Rights Division, General Services Administration, and Office of Management and Budget. *See* Dkt. Nos. 31, 33.

Honorable Katherine B. Forrest
Page 2

production two months after the Commission's report ("Report") is released—would "end up mooting the FOIA request by virtue of the delay," Dkt. No. 29 at 19:19-20, causing a "certain and imminent harm for which a monetary award does not adequately compensate." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017) (internal citations omitted). Plaintiffs would receive unacceptably "stale information," since "ongoing public and congressional debates about issues of vital national importance cannot be restarted or wound back." *Elec. Frontier Found. v. ODNI*, No. C 07-5278 SI, 2007 WL 4208311, at *6-7 (N.D. Cal. Nov. 27, 2007) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)).

Defendants' central criticism of Plaintiffs' requested timeline—under which Defendants would produce requested records only two months in advance of the Commission's anticipated report—is that Plaintiffs do not "need at least two months to publicize information from Defendants' productions." Dkt. No. 37 at 3. This argument fails for two reasons. *First*, document production is not the end of the story: the parties must resolve disagreements as to the sufficiency of Defendants' productions, after which Plaintiffs must adequately analyze the documents and communicate to the public that analysis. To have any effect, this must happen before or when the Report is released. *Second*, the Commission's work, and Plaintiffs' requests, are not limited to the Report. The Commission's past and present activities, while veiled in secrecy, have already affected voting rights.

A. *Defendants Must Complete Document Production In Advance of the Commission Report to Avoid Irreparable Harm.*

A February 28, 2018 deadline is necessary to allow Plaintiffs and the public sufficient time to address the basis of the Commission's May 2018 Report. To avoid irreparable harm, the following must happen within two months: (i) the parties must resolve disputes about the sufficiency of Defendants' productions and, if necessary, seek this Court's judgment to do so, and (ii) Plaintiffs must communicate to the public their analysis of the produced documents.

FOIA litigation rarely ends with Defendants making a single, totally satisfactory production. Plaintiffs' counsel has already raised significant concerns to Defendants' counsel regarding search terms used by certain Defendants, particularly Defendant DHS, and as Defendants have contemplated in submissions to the Court, Plaintiffs expect further discussions of this issue to follow production. *See* Dkt. No. 32 at 2 ("upon the completion of the releases . . . , the parties w[ill] confer to attempt to resolve any disputes regarding the sufficiency of those productions and the exemptions asserted"). Plaintiffs further expect that the scope of the Defendants' searches may be improperly limited – for example, with respect to the date cut-offs and the failure to determine whether any agency officials used private e-mail accounts to conduct official Commission business that would be responsive to Plaintiffs' requests. Defendants have already stated that they will be claiming exceptions and exemptions with regards to a good deal of responsive material, *see*, *e.g.*, *id.*; Dkt. No. 29 at 15:22-25 ("some documents may not even be statutorily subject to FOIA, and we need to isolate those out, quite apart from what exemptions

Honorable Katherine B. Forrest
Page 3

apply to things that are subject to FOIA").[2]  Thus, there is a substantial likelihood that Plaintiffs will challenge the sufficiency of Defendants' production.

Plaintiffs also must develop and then disseminate their analysis of the Defendants' productions to inform the public debate over the Commission, its activities, and its recommendations.[3]  To have any meaningful effect, the bulk of these activities must take place prior to and immediately upon release of the Commission's Report.  Defendants argue that the requested injunction would "only marginally" expedite production, and is therefore not worthwhile.  *See* Dkt. No. 37 at 3 (*quoting Daily Caller v. U.S. Dep't of State,* 152 F. Supp. 3d 1, 13 (D.D.C. 2015)).[4]  But if Defendants complete their productions at the end of July 2018—at which time the Commission's recommendations will be two months old and may already have influenced laws across the country—the opportunity for a fully informed public debate over the Commission's recommendations will have been lost.  Far from "marginal," Plaintiffs' request to receive records two months in advance of the Report provides the minimum amount of time required to avoid irreparable harm in this suit.

B.  *The Commission Is Already Curtailing Voting Rights.*

Although the parties have focused on the Commission's Report in previous submissions,[5] Plaintiffs' requests cover the full ambit of Commission activities, *see* Am. Compl. ¶¶ 29, 43, and the Commission's work is already affecting voting rights.  The  Commission is lending credibility to pernicious voter fraud myths, inducing the passage of state legislation restricting voting rights, and leading voters to deregister.  Aside from the forthcoming Report and consequent legislation, a delayed disclosure would cause irreparable harm by precluding the timely dissemination of information relevant to the Commission's current activities.

---

[2] Defendants cite *EPIC v. DOJ,* 15 F. Supp. 3d 32 (D.D.C. 2014), to claim subsequent litigation should not inform a court-ordered production schedule.  *See* Dkt. No. 37 at 3.  *EPIC* merely stands for the proposition that agencies may withhold materials from their initial production even where a request is urgent—not for the broad proposition that a court may not consider further disputes between the parties—even litigation—in determining when documents must be produced.  *See id.*at 46 ("EPIC cannot claim to be injured—much less 'irreparably' so—if the NSD withholds documents that that EPIC is not entitled to access in the first instance, and even full-throated protest regarding allegedly unreasonable processing delays does not alter that reality.").

[3] Defendants' production schedule would also cause Plaintiffs irreparable harm by precluding Plaintiffs from providing public comment to the Commission informed by responsive documents—thereby possibly influencing its recommendations—in advance of the Report.

[4] Defendants rely heavily on *Daily Caller* in urging the Court to deny Plaintiffs' request for an injunction. The case is inapposite.  In *Daily Caller,* the plaintiffs requested records that were already being made public on the State Department's website as the result of other FOIA litigation, and the plaintiffs based their request on an incorrect interpretation of FOIA requiring all agencies to make full productions within 20 days of a request. 152 F. Supp. at 4-5.

[5] Anticipating additional briefing, Plaintiffs' prior letters focused on harm related to the Report in an effort to keep their already lengthy letters from turning into full briefs.  *But see* Dkt. No. 25 at 5 & n.10 (noting Commission's present activities).  In their Opposition, Defendants argue that media coverage of the Commission's present activities weighs against a preliminary injunction.  *See* Dkt. No. 37 at 2 & n.2.

Honorable Katherine B. Forrest
Page 4

As Plaintiffs have previously noted, the Commission's leadership includes figures on the radical fringes of the voting rights conversation.[6]  *See* Am. Compl. ¶¶ 10-11.  Vice-Chair Kris Kobach is one of the few prominent government officials to have supported the President's wholly unsubstantiated allegations regarding voter fraud in the 2016 election.  Since his appointment to the Commission, Mr. Kobach has used his stature as the Vice-Chair to lend credence to these claims in both public statements[7] and op-eds published on Breitbart.[8]  Positions on the Commission cloak Mr. Kobach and his fellow commissioners in the authority of the executive—an authority these commissioners are actively using to influence public opinion.  Their claims inevitably affect the voting rights debate in ways subsequent revelations about the Commission—particularly revelations that come *after the Commission's Report*—cannot retroactively correct, any more than the debate can be "restarted or wound back."  *Elec. Frontier Found.*, 2007 WL 4208311, at *7.

Commission members are presently seeking to influence state legislation.  Commission members have made the case for new voter restrictions before organizations specifically dedicated to the drafting of state legislation, such as the highly influential American Legislative Exchange Council.[9]  Though major federal legislative initiatives targeting voting rights may await the Commission's report, state initiatives are well underway.  Already in 2017, 99 bills have been introduced across 31 states seeking to restrict voting access.  Five states have enacted and will soon implement restrictions.[10]  The disclosure of information about the Commission's methods that comes after the enactment of state legislation premised on these sorts of claims will not be sufficient to undo the damage they cause, particularly with the November 2018 national mid-term election drawing ever closer.

Relatedly, the Commission has directly caused voters to fear that their personal information may be compromised.  The Commission's June 2017 data requests caused thousands of registered voters in states across the nation to deregister.  *See* Am. Compl. ¶¶ 19-20.  Recently disclosed information regarding the Commission's plans for its database revealed that fears regarding voter

---

[6] Commission member Hans von Spakovsky has himself recognized this reality, as evidenced by emails in which Mr. von Spakovsky argued for the exclusion from the Commission of not just Democrats, but also "mainstream Republican officials and/or academics."  John Wagner, *Trump Voting Fraud Panel Member Lamented Adding Democrats, 'Mainstream' Republicans*, WASHINGTON POST, Sep. 13, 2017, http://wapo.st/2eVZXTM?tid=ss_mail&utm_term=.dde886dd3415.

[7] *See Trump Voter Fraud Commission Chief Casts Doubt on Result*, BBC, Jul. 19, 2017, http://www.bbc.com/news/world-us-canada-40663687 ("I think the President-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin between him and Hillary Clinton.").

[8] *See* Kris Kobach, *It Appears That Out-of-State Voters Changed the Outcome of the New Hampshire U.S. Senate Race*, BREITBART, Sep. 7, 2017, http://www.breitbart.com/big-government/2017/09/07/exclusive-kobach-out-of-state-voters-changed-outcome-new-hampshire-senate-race/.  For an explanation of why Mr. Kobach's claims were unsubstantiated and inappropriate, *see Tensions and Protest Mark Trump Voting Commission Meeting*, NPR, Sep. 12, 2017, https://www.npr.org/2017/09/12/550518986/tension-and-protests-mark-trump-voting-commission-meeting.

[9] *See* Sam Levine, *3 Members of Trump Panel Warn of Voter Fraud to Influential Conservative Group*, HUFFINGTON Post, Dec. 7, 2017, https://www.huffingtonpost.com/entry/trump-voter-fraud-commission-alec_us_5a29bfbde4b069ec48abff48.

[10] *See* Brennan Center for Justice, *Voting Laws Roundup 2017*, May 10, 2017, https://www.brennancenter.org/analysis/voting-laws-roundup-2017.

Honorable Katherine B. Forrest
Page 5

data privacy are well-founded.[11]  As the Commission continues to operate in an opaque manner, it can reasonably be expected to chill efforts of citizens to vote.  As a consequence, each day Defendants deprive Plaintiffs of information about the Commission's activities and each day that Defendants fail to provide responsive records, the damage increases.[12]

The records Plaintiffs request are necessary to shed light on the Commission's activities—both the basis of the Commission's ultimate recommendations and the processes by which it operates.  To effect FOIA's salutary purpose here, the Commission's activities must be subject to public scrutiny as soon as possible, and certainly before the public debate over the Commission concludes and federal, state, and local governments act on the Commission's recommendations.

## II.     Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs have shown they are likely to succeed on the merits because Defendants' proposed deadlines do not satisfy FOIA's mandate to process expedited requests "as soon as practicable" and to make requested records "promptly available."  5 U.S.C. §§ 552(a)(6)(C)(ii), (E)(iii).  As Defendants acknowledge, what is "practicable" or "prompt" cannot be clearly defined and depends on the circumstances surrounding a particular request.  *See* Dkt. No. 37 at 4. Defendants' proposed deadlines do not meet this standard.  *See* Dkt. No. 25 at 1-3; Dkt. No. 33 at 3.  Defendants' assertions that they are processing an increased number of FOIA requests and engaged in increased FOIA litigation, *see* Dkt. Nos. 37-1, 37-2, 37-3, do not alter the manifest urgency of Plaintiffs' requests or permit the agencies to produce records long after they will have any public value.

In particular, DHS's proposal to complete production by July 31, 2018 would not make records "promptly available" to Plaintiffs.[13]  DOJ-OLC and DHS have granted Plaintiffs' requests for expedited processing, thus acknowledging their urgency and importance.  As Defendants acknowledge, the role of this Court is to "ensur[e] that the agency continues to exercise due diligence in processing the request." Dkt. No. 37 at 6 (citing *CREW v. FEC*, 711 F. 3d 180, 189 (D.C. Cir. 2013)).  DHS contends that in order to meet the February 28, 2018 deadline, the agency "would have to shift several FOIA specialists from processing non-litigation-related requests" and "prioritize[] Plaintiff[s'] request over the many expedited requests that were received . . . prior to Plaintiff[s'] requests."  Dkt. No. 37-3 ¶¶ 19-20.  These actions are precisely what FOIA requires given the urgent nature of this suit.  The fact that DHS is subject to court-ordered production in

---

[11] *See generally Former Nat'l Security & Tech. Officials Amici Curiae Br. Supporting Pl. Mem. Opp. Mot. Dismiss*, *Common Cause v. PACEI*, No. 1:17-cv-01398-RCL (D.D.C. Dec. 5, 2017), ECF 38-1 (discussing readily identifiable dangers posed by the Commission's data practices).

[12] Since filing this suit, at least one federal election candidate has used the rhetoric of "systemic voter fraud" to undermine the results of an election without any evidence.  *See* Alan Blinder, *Alabama Certifies Jones Win, Brushing Aside Challenge from Roy Moore*, NY TIMES, Dec. 28, 2017, https://www.nytimes.com/2017/12/28/us/politics/roy-moore-block-election.html.

[13] Plaintiffs appreciate the difference between a "determination" and "production" under FOIA.  *See* Dkt. No. 37 at 4-6.  Defendants' failure to issue a determination within the statutory deadline, however, is not grounds to circumvent FOIA's requirement for prompt document production.

Honorable Katherine B. Forrest
Page 6

three other cases, *see* Dkt. No. 37-3 ¶ 13, underscores DHS's ability to tailor its FOIA response pursuant to an order of this Court.  As set forth in Plaintiffs' previous submissions, a February 28, 2018 production deadline would require the agencies to review a modest number of documents each day, *see* Dkt. No. 24 at 2-3; Dkt. No. 33 at 3, and certainly at a "practicable" rate for major federal agencies.[14]

For the reasons set forth above, Plaintiffs respectfully request that the Court order Defendants to complete production of responsive records by February 28, 2018.

We thank the Court for its attention to this matter.

Respectfully submitted,

 /s/ Jeremy M. Creelan
Jeremy M. Creelan

cc:  Assistant United States Attorney Casey Kyung-Se Lee (via ECF)

---

[14] For example, DHS's net discretionary funding will exceed $40 billion in fiscal year 2018.  Department of Homeland Security, *FY 2018 Budget in Brief*,
https://www.dhs.gov/sites/default/files/publications/DHS%20FY18%20BIB%20Final.pdf.