**Enclosure A**
Referral Letter and Exhibits

United States Senate

WASHINGTON, DC 20510

October 4, 2019

Mr. Corey Amundson
Director and Chief Counsel
Office of Professional Responsibility
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Suite 3266
Washington, DC 20530-0001

Dear Director Amundson:

We write to request that your office review whether the conduct of John Gore, former Principal Deputy Assistant Attorney General of the Civil Rights Division (CRT) of the Department of Justice (DOJ), described herein, violated OPR's ethics framework. Although Mr. Gore has reportedly left DOJ, his conduct remains at issue in at least two ongoing lawsuits, and the Department and its lawyers continue to rely on his testimony in these and other matters.[1] As discussed in greater detail below, other documents within DOJ's possession—though not produced by DOJ in relevant litigation—cast significant doubt on Mr. Gore's truthfulness in these matters. This may implicate not only his professional conduct, but the conduct of other attorneys representing DOJ in matters involving Mr. Gore.

We have obtained documents that raise questions about Mr. Gore's compliance with federal records laws and about the truthfulness of testimony he gave in a sworn declaration in litigation. We believe these documents provide evidence that Mr. Gore either knowingly made misrepresentations in a court filing about the nature of his personal email communications with Republican Party election officials concerning voting issues, or that he acted in reckless disregard of his duty of candor to the court. Mr. Gore's statements could constitute professional misconduct under OPR's framework.[2] Moreover, to the extent other Department attorneys have relied in court on testimony they may have known to be untruthful, that raises separate and equally important legal ethical questions for your office to resolve.

Mr. Gore's credibility is already under scrutiny in litigation regarding the addition of a question about citizenship to the Census. In that case, the government is now facing a sanctions motion based on questions about Mr. Gore's testimony on the origins of a letter from DOJ to the Department of Commerce requesting the addition of that question.[3] This new evidence suggests a pattern of possible misconduct that should be thoroughly and promptly investigated by OPR.

---

[1] See *State of New York v. U.S. Dep't of Commerce*, No. 18-cv-02921 (S.D.N.Y.); *Brennan Center for Justice v. U.S. Dep't of Justice*, No. 17-cv-6335 (S.D.N.Y.).

[2] *See* U.S. Dep't of Justice Office of Prof. Resp., Analytical Framework (2005), https://www.justice.gov/sites/default/files/opr/legacy/2006/03/15/framework.pdf

[3] *See* Motion for Sanctions, *State of New York v. U.S. Dep't of Commerce*, No. 18-cv-02921 (S.D.N.Y. July 16, 2019), ECF No. 635.

To our knowledge, DOJ attorneys in these lawsuits have not identified the documents discussed in this letter that cast doubt on the veracity of Mr. Gore's testimony, or otherwise updated relevant court filings. This raises separate and ongoing legal ethical questions for OPR to investigate under its analytical framework. It therefore remains critical that OPR investigate the truthfulness of Mr. Gore's testimony, as well as the knowledge of other Department attorneys with respect to the truthfulness of that testimony.

**Background**

In August 2017, the Brennan Center for Justice and The Protect Democracy Project initiated FOIA litigation against DOJ in the U.S. District Court for the Southern District of New York (S.D.N.Y.) to obtain documents related to President Trump's Presidential Advisory Commission on Election Interference (PACEI).[4] DOJ initially provided plaintiffs with records resulting from a search of official DOJ employee emails. This initial search identified two September 2017 email threads that had been forwarded to the official DOJ email account of then-Acting CRT AAG John Gore from Mr. Gore's personal email account[5]. These records included several emails from Mr. Gore's personal email account showing communications from May to September 2017 among Mr. Gore, Chicago Republican Party Chairman Chris Cleveland, and PACEI member Christy McCormick. The communications concerned Mr. Cleveland's complaints that Chicago allegedly had a 16,000-vote discrepancy in the 2016 election (i.e., that Chicago had reported more votes than voters).[6]

In April 2019, in light of these emails, and because Mr. Gore had been delinquent in forwarding these emails to his official account as required by 44 U.S.C. § 2911(a), the court granted plaintiffs' motion to search Mr. Gore's personal email records for any additional documents relevant to the plaintiffs' inquiry.[7]

**Mr. Gore's Declaration**

In May 2019, the government moved—ultimately unsuccessfully—for a reconsideration of the court's order to search Mr. Gore's personal emails.[8] The government's motion relied on a May 28 declaration from Mr. Gore, signed under penalty of perjury, attesting that he had not used his personal email for agency business.[9] With respect to the previously disclosed emails from his personal account, Mr. Gore stated:

---

[4] Complaint, *Brennan Center for Justice v. U.S. Dep't of Justice*, No. 17-cv-6335 (S.D.N.Y. Aug. 21, 2017), ECF No. 1.

[5] See Exhibit 1.

[6] Ibid.

[7] *Brennan Center for Justice v. U.S. Dep't of Justice*, 377 F. Supp. 3d 428, 435 (S.D.N.Y. 2019) ("The record is clear that Acting Assistant Attorney Gore sent and received emails relating to voter fraud . . . on [his] private email account[]. Moreover, Gore was substantially late in forwarding emails from his private account to official accounts, beyond the twenty-day period required by 44 U.S.C. § 2911(a), for example, an email of July 5, 2017 that was not forwarded until September 27, 2017, eighty-four days later").

[8] *Brennan Center for Justice v. U.S. Dep't of Justice*, No. 17-cv-6335 (S.D.N.Y. Jun. 28, 2019), ECF No. 111.

[9] See Exhibit 2.

> *In May 2017, an individual [Chris Cleveland] whom I knew from outside my work for the Division emailed my personal email account to ask if I 'had a relationship' with the PACEI. I informed this individual that 'I d[idn't] have any relationship with the task force.' I offered to help put the individual in contact with 'someone who does.' I later put this individual in contact with Christy McCormick, a member of the PACEI. I did not understand or interpret [Mr. Cleveland]'s inquiry to be asking about the work of the Division, or to constitute an official-capacity communication by me. Neither I, nor the Division, had any relationship with the PACEI. Therefore, I believed that my communications with [Mr. Cleveland] were in my personal capacity . . . [I]n my view, the communications were not official-capacity communications, nor were they sent or received in the course of my employment with the Department of Justice.*[10]

The same month Mr. Gore submitted this sworn declaration, the watchdog group American Oversight obtained, through a separate FOIA suit, additional email records sent to and from Mr. Gore's official DOJ account in March 2017.[11] These March 2017 emails contradict Mr. Gore's declaration in two ways: (1) upon receiving information from Mr. Cleveland about the Chicago vote discrepancy, Mr. Gore acted on that issue in his official DOJ capacity; and (2) Mr. Gore was dishonest, or at least not wholly truthful, about the nature of his relationship with Mr. Cleveland.

**1. Personal vs. official capacity**

Mr. Gore's declaration that his May-September 2017 personal email communications were "in [his] personal capacity" and were "not official-capacity communications" omits other communications that would show this to be untrue. In a March 24, 2017, email—two months earlier—Mr. Cleveland emailed Mr. Gore's superior, then-Acting CRT AAG Tom Wheeler, to request DOJ action on alleged vote discrepancies in Chicago, the same topic Mr. Cleveland and Mr. Gore subsequently discussed.[12] Mr. Wheeler acknowledged that Mr. Cleveland's complaint fell within CRT's purview and directed Mr. Gore to assist Mr. Cleveland in Mr. Gore's capacity as Deputy Assistant Attorney General (DAAG) of CRT. Specifically, Mr. Wheeler wrote to Mr. Cleveland that his complaint "fall[s] within our voting section," and added that he was "CC'ing John Gore, my DAAG who oversees voting to follow up."[13] Mr. Gore replied to both men by stating that the issue might be more appropriate for the DOJ's Public Integrity Division, but assured Mr. Cleveland that "we'll chase it down and figure it out."[14] The email exchange suggests that on March 28, 2017, Mr. Gore spoke with Mr. Cleveland on the phone and then emailed White House staff on his behalf. Mr. Gore's email to the White House stated that he "spoke with Mr. Cleveland this afternoon," that "[Mr. Cleveland] would be reaching back out"

---

[10] See Exhibit 2 at 7-9.

[11] Letter from U.S. Dep't of Justice Civil Right Division's Freedom of Information/Privacy Acts Branch to American Oversight in response to October 2018 Freedom of Information Act Request (May 23, 2019) (on file with author).

[12] See Exhibit 3.

[13] Ibid.

[14] Id.

about the vote discrepancy issue, and also asked "if anyone [at the White House] is interested in discussing this."[15]

### 2. Relationship with Mr. Cleveland

Mr. Gore states in his declaration about the May through September emails that Mr. Cleveland was an individual he knew from "outside [his] work for the [Civil Rights] Division." While that may be true, it is misleading. The March 24 to March 28, 2017 emails show that Mr. Gore and Mr. Cleveland interacted through Mr. Gore's official DOJ email account about this same topic. Mr. Gore's declaration to the federal court leaves the clear impression that he and Mr. Cleveland had not spoken about the alleged voting discrepancies in Chicago before May 2017. In fact, they had, and they had done so in Mr. Gore's official capacity, with Mr. Gore offering to "chase…down and figure…out" which DOJ component should review the allegations, then elevating the issue to the White House. This likely explains Mr. Cleveland's May 11, 2017, email to Mr. Gore's personal account, where Mr. Cleveland opened by saying: "[t]hanks for speaking with me a few weeks back about the discrepancies in Chicago's vote."[16]

## Request for OPR Investigation

Mr. Gore may have violated at least three standards or obligations which applied to his professional conduct: (1) making a declaration under oath that he knew not to be true; [17] (2) "mak[ing] a false statement of fact or law to a tribunal;"[18] and (3) "engag[ing] in conduct that seriously interferes with the administration of justice."[19] The facts at issue were entirely within Mr. Gore's knowledge and control, specifically the existence of emails and communications involving him during his employment at CRT. Mr. Gore failed to provide a full accounting of his prior relationship with Mr. Cleveland and related official actions to a federal court, focusing only on the relationship and actions reflected in emails that had been produced in discovery. That could have been calculated to limit further examination of his personal email. This came at a time when Mr. Gore's truthfulness about communications with individuals outside DOJ about official business was being questioned by yet another federal court, and is currently the subject of a sanctions motion against DOJ.

These facts suggest conduct which falls below the standards for candor and integrity expected of a senior official at the Department of Justice. As noted above, Mr. Gore's conduct remains at issue in at least two ongoing lawsuits.[20] To our knowledge, DOJ attorneys in these lawsuits have not identified the documents disclosed to American Oversight, or otherwise updated relevant court filings. Even though Mr. Gore has left DOJ, his conduct raises separate and ongoing legal ethical questions for OPR to investigate under its analytical framework.

---

[15] See Exhibit 3.
[16] See Exhibit 2.
[17] *See* 18 U.S.C.A. § 1621 (2019) (describing "perjury generally").
[18] Rules of Professional Conduct R. 3.3(a)(1) (D.C. Bar 2019) (Duty of Candor).
[19] Rules of Professional Conduct R. 8.4 (D.C. Bar 2019) (Misconduct).
[20] See *State of New York v. U.S. Dep't of Commerce*, No. 18-cv-02921 (S.D.N.Y.); *Brennan Center for Justice v. U.S. Dep't of Justice*, No. 17-cv-6335 (S.D.N.Y.).

Thank you for your prompt attention to this matter.

Sincerely,

Sheldon Whitehouse
United States Senator

Patrick Leahy
United States Senator

Cc: Eric Dreiband, Assistant Attorney General for the Civil Rights Division

# APPENDIX

# Exhibit 1:

# John Gore's Personal Emails from May – September 2017

**From:** John Gore (b)(6) gmail.com]
**Sent:** 9/27/2017 11:22:24 PM
**To:** Gore, John (CRT) [John.Gore@crt.usdoj.gov]
**Subject:** Fwd: Chicago vote problems

---------- Forwarded message ----------
From: **John Gore** (b)(6) @gmail.com>
Date: Tue, Sep 5, 2017 at 6:43 PM
Subject: Fwd: Chicago vote problems
To: Christy (b)(6) @aol.com>

Christy:

I hope you are well. Per below, Chris Cleveland sends the link and asks to be put in touch with you dir[illegible] like me to do that?

Thanks,

---------- Forwarded message ----------
From: **Chris Cleveland** <chris.cleveland@chicagogop.com>
Date: Tue, Sep 5, 2017 at 3:48 PM
Subject: Re: Chicago vote problems
To: John Gore (b)(6) @gmail.com>

John,

We finally got some national attention on the problem:

http://www.foxnews.com/politics/2017/09/05/chicago-reported-thousands-more-votes-than-voters-in-2016-gop-official-says.html

Can you get this story in front of your friend at the Commission? Can you put me in touch with them?

Chris

On Wed, Jul 5, 2017 at 6:49 PM, John Gore (b)(6) @gmail.com> wrote:
Chris:

I did pass this along to someone close to the Commission. I just sent a reminder so it would be back on their radar screen.

Thanks.

On Fri, Jun 30, 2017 at 3:36 PM, Chris Cleveland <chris.cleveland@chicagogop.com> wrote:

John,

It appears that the Election Integrity Commission is finally gearing up. They're in the press today.

Did you succeed in passing this matter on to anyone on the Commission? This might be a good time to ping them again.

Chris

On Mon, May 15, 2017 at 3:03 PM, Chris Cleveland <chris.cleveland@chicagogop.com> wrote:
Thanks, John. Will do.

On Mon, May 15, 2017 at 2:44 PM, John Gore (b)(6) @gmail.com> wrote:
Thanks, Chris. I have sent this along to someone I know who may be closer to the task force than I am. If you come across any more info, please feel free to send it along.

On Fri, May 12, 2017 at 10:34 AM, Chris Cleveland <chris.cleveland@chicagogop.com> wrote:
Here it is:

In January the Chicago Republican Party filed a FOIA request with the Chicago Board of Elections for the list of voters who had voted in the November 2016 general elections.

The board responded with a list of 1,101,178 individuals. A quick check of the elections returns published on the Chicago Board of Elections website showed that 1,115,664 votes had been cast. The difference between the number of voters in the file and the number of votes cast was 14,000, or about 1.3%.

There should be never be more votes than voters; every ballot cast should be recorded against a registered voter.

A breakdown of the votes by precinct shows that the discrepancies are not evenly distributed. Fifteen precincts show 100 more ballots cast than voters. One precinct shows more ballots cast than registered voters. Some precincts show a negative discrepancy, that is, more voters than votes cast. Subtracting out those precincts, the total discrepancy is about 16,000 votes or 1.4%.

The Chicago Republican Party made an inquiry, pursuant to FOIA, as to the source of the discrepancies. Despite repeated followups, the board has failed to respond except to say that they have been "reviewing all discrepancies" and that there will be a "final report". It's been more than three months since the first inquiry and more than six weeks since the report was due. At this point it seems to be more than a simple clerical error.

Given the history of voter fraud in Chicago, the magnitude of the problem, and the Chicago Board of Election's history of favoring the Democrats, the problem warrants external scrutiny.

A spreadsheet is attached. Tab one shows the discrepancies by precinct. Tab two shows the same data sorted with the largest discrepancies first.

On Fri, May 12, 2017 at 9:17 AM, John Gore (b)(6) @gmail.com> wrote:
Chris:

Good to hear from you. I don't have any relationship with the task force, but if you'd like to send me a write-up, I'll see if I can get it to someone who does.

Thanks.

On Thu, May 11, 2017 at 4:39 PM, Chris Cleveland <chris.cleveland@chicagogop.com> wrote:
John,

Thanks for speaking with me a few weeks back about the discrepancies in Chicago's vote.

I saw this today:

http://www.foxnews.com/politics/2017/05/11/trump-to-sign-order-launching-voter-fraud-commission.html

Do you have any relationship with this group? Do you know anyone in charge there? I'd like to get a brief writeup on the problem into someone's hands.

Chris

--
Chris Cleveland
Chairman, Chicago Republican Party
312-339-2677

--
Chris Cleveland
Chairman, Chicago Republican Party
312-339-2677

--
Chris Cleveland
Chairman, Chicago Republican Party
312-339-2677

--
Chris Cleveland
Chairman, Chicago Republican Party
312-339-2677

--
Chris Cleveland
Chairman, Chicago Republican Party
312-339-2677

# Exhibit 2:

# John Gore's Declaration Under Penalty of Perjury



U.S. Department of Justice
Civil Rights Division

TC:ANF:RG3
19-00236-F

*Freedom of Information/Privacy Acts Branch - PHB*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

7/29/2019

*Via Electronic Mail Only*
Mr. Austin Evers
American Oversight
1030 15th Street, N.W.
Suite B255
Washington, DC 20005
foia@americanoversight.org

Dear Mr. Evers:

This is in further response to your July 10, 2019 Freedom of Information Act request seeking access to records pertaining to the "declaration of John Gore relied on by DOJ in support of its May 28, 2019, Motion for Reconsideration in Brennan Center for Justice et al. v. U.S. Department of Justice et al., Case No. 17 Civ. 6335 (AKH) (S.D.N.Y.), ECF No. 105 at 8."

After review of the responsive Civil Rights Division documents, I have determined that the enclosed document may be released to you in its entirety.

I hope the Civil Rights Division has been of some assistance to you in this matter.

Sincerely,

Tink Cooper

Tink Cooper, Acting Chief
Freedom of Information/Privacy Acts Branch
Civil Rights Division

AMERICAN OVERSIGHT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRENNAN CENTER FOR JUSTICE, and THE PROTECT DEMOCRACY PROJECT,

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. GENERAL SERVICES ADMINISTRATION, OFFICE OF MANAGEMENT AND BUDGET, and U.S. SOCIAL SECURITY ADMINISTRATION,

Defendants.

17 Civ. 6335 (AKH)

**DECLARATION OF JOHN GORE**

JOHN GORE, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am the Principal Deputy Assistant Attorney General in the United States Department of Justice's Civil Rights Division (the "Division"). I have held that position since July 2017. In that capacity, I report directly to the Assistant Attorney General for Civil Rights. I joined the Division in January 2017. From January through late July 2017, I was a Deputy Assistant Attorney General in the Division. From late July 2017 through early November 2018, I served as the Division's Acting Assistant Attorney General while the nomination of Eric Dreiband to be Assistant Attorney General was pending before the Senate. In each position that I have held with the Division, I have served as part of the Division's senior management team, which has responsibility for the overall supervision of the Division's enforcement of the federal statutes and regulations that fall within the Division's mission, including the Voting Rights Act of 1965.



2. As the Principal Deputy Assistant Attorney General, I assist in the general supervision of the activities of the Division. I advise the Assistant Attorney General on major policy decisions requiring his personal attention. I advise on and decide questions of policy and procedure arising in connection with the initiation, conduct, and termination of civil and criminal civil rights litigation, subject to review by the Assistant Attorney General. I also confer with, advise, and instruct senior members of the Division, and other Division and Department attorneys on matters relating to the enforcement of statutes, executive orders, and regulations assigned to the Division.

3. As Acting Assistant Attorney General, I was responsible for general supervision of the activities of the Division. I set policy and procedures arising in connection with the initiation, conduct, and termination of civil rights litigation, both civil and criminal. I advised and instructed senior members of the Division and Department leadership on matters relating to the enforcement of statutes, executive orders, and regulations assigned to the Division.

4. I submit this declaration in support of what I understand will be a motion to reconsider aspects of the Court's Opinion and Order dated April 30, 2019, which among other things directed a search of my personal emails. The following statements are based upon my personal knowledge.

5. Since I joined the Division in January 2017, I have not used personal email to conduct any Division business related to the Presidential Advisory Commission on Election Integrity ("PACEI" or "task force"). In fact, neither I, nor the Division, had any relationship with the PACEI. Moreover, to my best recollection and in accordance with my intention and practice, I have not used personal email to conduct any other Division business.

6. I have received training on the Department of Justice's rules regarding use of personal email for work. I understand that, absent exigent circumstances, I am required to use official email to conduct Division business. In addition, I understand that if I receive an email used to conduct Division business in my personal email account, I must forward it to my official email address within 20 days. I have complied with these requirements.

7. In May 2017, an individual whom I knew from outside my work for the Division emailed my personal email account to ask if I "had a relationship" with the PACEI. I informed this individual that "I d[idn't] have any relationship with the task force." I offered to help put the individual in contact with "someone who does." I later put this individual in contact with Christy McCormick, a member of the PACEI.

8. I did not understand or interpret the individual's inquiry to be asking about the work of the Division, or to constitute an official-capacity communication by me. Neither I, nor the Division, had any relationship with the PACEI. Therefore, I believed that my communications with this individual were in my personal capacity, not my official capacity.

9. In September 2017, in an abundance of caution and to ensure that agency records were complete in the event anyone viewed this communication as work-related notwithstanding my understanding that it was not, I forwarded the email exchange described herein to my official email account. That is the email exchange that is referenced in the Court's April 30 Opinion and Order. Despite my having done so, in my view, the communications were not official-capacity communications, nor were they sent or received in the course of my employment with the Department of Justice.

10. I am unaware of having any official-capacity emails on my personal account and, based on my usual and consistent practice, I am confident that no such emails exist within my

personal email account. At all times that I have been employed by the Department of Justice, it has been my practice to engage in email communications to conduct official agency business only on my official Department of Justice email account, using the agency's email system.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, DC
May 28, 2019

John M. Gore
Principal Deputy Assistant Attorney General
United States Department of Justice

# Exhibit 3:

# John Gore's Official DOJ Emails from March 2019

**From:** [redacted]@crt.usdoj.gov [redacted]@crt.usdoj.gov]
**Sent:** 3/29/2017 9:10:58 AM
**To:** Wheeler, Tom (CRT) [/O=USDOJ/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Twheelere0b]
**CC:** [redacted] EOP/WHO [redacted]@who.eop.gov]; [redacted] EOP/WHO [redacted]@who.eop.gov]; [redacted]@gmail.com
**Subject:** Re: Chicago voting problems -- need referral

I'm available to meet any time as well. As I understand it, you may need to loop in counsel's office.

Sent from my iPhone

On Mar 28, 2017, at 4:50 PM, Wheeler, Tom (CRT) <[redacted]@crt.usdoj.gov> wrote:

Sure, let me know when you want to get together.

Tom Wheeler
Acting Assistant Attorney General
Civil Rights Division
United States Department of Justice
[redacted]@usdoj.gov
[redacted]

**From** [redacted] EOP/WHO [mailto [redacted]@who.eop.gov]
**Sent:** Tuesday, March 28, 2017 4:12 PM
**To:** Gore, John (CRT) [redacted]@crt.usdoj.gov>; Wheeler, Tom (CRT) [redacted]@crt.usdoj.gov>
**Cc:** Bash, Zina G. EOP/WHO [redacted]@who.eop.gov>; [redacted]@gmail.com
**Subject:** RE: Chicago voting problems -- need referral

Thanks, [redacted]

Hi, John (and Tom). Happy to talk with Mr. Cleveland or anyone else about election concerns. We have had a few private individuals approach us with reports of state and local voting concerns, and possible legislative ideas.

On a related note: this is not urgent, but is there any chance we could get CRT's perspective at some point in April on applications of the Voting Rights Act going forward? I can refine this request, if necessary. We're happy to come to DOJ to make it more convenient.

[redacted]
[redacted]

**From:** [redacted]@gmail.com [mailto [redacted]@gmail.com]
**Sent:** Tuesday, March 28, 2017 3:13 PM
**To:** Gore, John (CRT) [redacted]@usdoj.gov>
**Cc:** Wheeler, Tom (CRT) [redacted]@usdoj.gov> [redacted] EOP/WHO <[redacted]@who.eop.gov> [redacted], [redacted] EOP/WHO [redacted]@who.eop.gov>
**Subject:** Re: Chicago voting problems -- need referral

AMERICAN OVERSIGHT

I'm adding my colleague (b)(6) on the DPC who has worked on similar issues. Thanks.

Sent from my iPhone

On Mar 28, 2017, at 3:09 PM, Gore, John (CRT) < @usdoj.gov> wrote:

I spoke with Mr. Cleveland this afternoon. He said he would be reaching back out to about this issue as well. Let me know if anyone is interested in discussing this. Thanks.

**From:** Wheeler, Tom (CRT)
**Sent:** Saturday, March 25, 2017 5:35 PM
**To:** Gore, John (CRT) < @crt.usdoj.gov>
**Cc:** @gmail.com
**Subject:** Re: Chicago voting problems -- need referral

Thx

Sent from my iPhone

On Mar 25, 2017, at 12:23 PM, Gore, John (CRT) < @crt.usdoj.gov> wrote:

This may actually be an issue for Public Integrity (Criminal Division), but we'll chase it down and figure it out.

Sent from my iPhone

On Mar 25, 2017, at 12:11 PM, Wheeler, Tom (CRT) < @crt.usdoj.gov> wrote:

This fall within our voting section. I am CC'ing John Gore, my DAAAG who oversees voting to follow up.

Sent from my iPhone

On Mar 24, 2017, at 7:39 PM, " @gmail.com" < @gmail.com> wrote:

Let me know if this is something you're interested in.

Sent from my iPhone

Begin forwarded message:

**From:** Chris Cleveland <chris.cleveland@chicagogop.com>
**Date:** March 24, 2017 at 2:43:12 PM EDT
**To:** @gmail.com
**Subject: Chicago voting problems -- need referral**

We've discovered a potentially serious problem with the 2016 election returns in Chicago. There's a 16,000 vote discrepancy in the data, which is possibly tied to the new same-day registration system.

You're one of the few people I know at the USDOJ. Can you refer me to the person there who have the power to look into the problem, and, if warranted, start an investigation?



I'll be happy to share all the details if you're interested.

Chris


--
Chris Cleveland
Chairman, Chicago Republican Party
43rd Ward Republican Committeeman
312-339-2677



**Enclosure B**
Opinion and Order Granting Partial Summary Judgment (Dkt. 99)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

BRENNAN CENTER FOR JUSTICE AT NEW YORK UNIVERSITY SCHOOL OF LAW; THE PROTECT DEMOCRACY PROJECT, INC.

Plaintiffs,

-against-

U.S. DEPARTMENT OF JUSTICE; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. GENERAL SERVICES ADMINISTRATION; OFFICE OF MANAGEMENT AND BUDGET; U.S. SOCIAL SECURITY ADMINISTRATION,

Defendants.

---------------------------------------------------------- X

**OPINION AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT**

17 Civ. 6335 (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/30/19

ALVIN K. HELLERSTEIN, U.S.D.J.:

I write to resolve two disputes in this Freedom of Information Act ("FOIA") case. The matter arises in the context of an investigation of alleged voter fraud, commissioned and then aborted by the President and, plaintiffs allege, continued in other ways by other agencies.

On May 11, 2017, President Donald J. Trump established the Presidential Advisory Commission on Election Integrity ("Commission") to study and report on voter fraud: "vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting." Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).[1] On

[1] Vice President Mike Pence chaired a fifteen-member Commission. Its vice chair was Kansas Secretary of State Kris Kobach. The Commission included Indiana Secretary of State Connie Lawson, New Hampshire Secretary of State William Gardner, Maine Secretary of State Matthew Dunlap, former Ohio Secretary of State J. Kenneth

January 3, 2018, just seven months later, President Trump disbanded the commission. Exec. Order No. 13,820, 83 Fed. Reg. 13,820 (January 3, 2018). In a statement issued that day, the Press Secretary announced that President Trump chose to dissolve the Commission "[r]ather than engage in endless legal battles at taxpayer expense." The White House, Office of the Press Secretary, *Statement on the Presidential Advisory Commission on Election Integrity* (Jan. 3, 2018), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-presidential-advisory-commission-election-integrity. According to the statement, President Trump "asked the Department of Homeland Security to review its initial findings and determine next courses of action." *Id.*

Plaintiffs Brennan Center for Justice at New York University School of Law and the Protect Democracy Project, Inc. (collectively, "Plaintiffs") made demand under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for the documents of the Commission's work, filed this suit, and subsequently moved for an order to compel the U.S Department of Justice ("DOJ"), U.S. Department of Homeland Security ("DHS"), U.S. General Services Administration ("GSA"), U.S. Office of Management and Budget ("OMB"), and U.S. Social Security Administration ("SSA") (collectively "Defendants" or "Government") to produce the documents responsive to Plaintiffs' FOIA requests.[2] Two issues remain for my determination: 1)

---

Blackwell, and Election Assistance Commission Commissioner Christy McCormick. The White House, Office of the Press Secretary, *President Announces Formation of Bipartisan Presidential Commission on Election Integrity* (May 11, 2017), https://www.whitehouse.gov/briefings-statements/president-announces-formation-bipartisan-presidential-commission-election-integrity/; Wedoff Decl., ECF 77-2, at 2.

[2] Plaintiffs have not sought records directly from Commission members or the Commission, which Plaintiffs concede is not an "agency" subject to FOIA. 5 U.S.C. § 552(f)(1); *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980); *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009); *see* Tr., ECF 92, at 22.

whether search terms adopted by DHS and OMB, narrower than those adopted by the DOJ, SSA, and GSA,[3] are reasonable and appropriate or too narrow to carry out a reasonable and responsive search; and 2) whether Defendants should be required to search the private email accounts of Acting Assistant Attorney General John Gore ("Gore") and DOJ attorney Maureen Riordan ("Riordan"), and if "potentially responsive agency records [exist] outside of a Department records system, such as in a personal email account." Gore and Riordan, although not Commission members, received emails from Commission members, concerning Commission business, in their personal email accounts. Gore also sent emails concerning Commission business to a Commission member at her personal email address.

Both sides move for summary judgment. I rule for Plaintiffs on both issues.

**Factual Background**

1. <u>The Presidential Advisory Commission on Election Integrity</u>

Plaintiffs allege that the Commission, established by President Trump to "promote fair and honest Federal elections" by detecting voter fraud, was really intended to erect legal barriers to voting by eligible citizens. Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017). Plaintiffs believe that the production of relevant documents may enable them to substantiate their claims. On June 28, 2017, Kris Kobach, Vice Chair of the Commission, sent letters to state election officials seeking publicly-available voter roll data, including names,

---

[3] Plaintiffs represent in its reply brief that they are discontinuing their earlier challenge to the DOJ-OIP, DOJ-OLC, GSA, and SSA search terms based on the Government's subsequent disclosures. Reply at 9. At oral argument, Plaintiffs further represented that, based on additional disclosures, it was withdrawing its requests for supplemental search terms for DOJ-CRT.

addresses, political party affiliation, partial social security numbers, voter history, active/inactive status, felony status, registration status in another state, military status, and overseas citizen information. Supp. Compl. ¶ 17. The effect of these inquires and other Commission activity, Plaintiffs allege, was to chill registrations of voters and to increase cancellations of voter registrations. Allegedly, nearly 4,000 registrations were cancelled in Colorado and 1,715 in Florida, more than double the cancellations in prior years. Supp. Compl. 19.

President Trump formally dissolved the Commission in January 2018. However, Plaintiffs allege, DHS has continued its work. Plaintiffs allege that Immigration and Customs Enforcement ("ICE"), an agency of DHS, continued the work of the Commission, evidenced by a subpoena issued by the U.S. Attorney of the Eastern District of North Carolina on August 31, 2018 to the State Board of Elections and Ethics Enforcement and forty-four counties in North Carolina, seeking voter records and ballots. Pl. Br. at 5–6. As of March 2019, an investigation of election fraud remained active in North Carolina.

2. Plaintiffs' FOIA Requests

In May 2017 and July 2017, Plaintiffs sent eight FOIA requests to the U.S. General Services Administration ("GSA"), Department of Homeland Security ("DHS"), Office of Management and Budget ("OMB"), and several sections of the Department of Justice ("DOJ")—its Office of Information Policy ("OIP"), Civil Rights Division ("CRT"), and Office of Legal Counsel ("OLC")—seeking documents and communications related to the Commission's formation, goals, and activities. *See* ECF 77-2 to 77-9. After filing this suit, Plaintiffs filed three additional FOIA requests on October 18 and 19, 2017, to DOJ-OIP, SSA, and DHS. *See* ECF 77-10 to 77-12 (seeking information on the Commission's use of SSA resources in carrying out its activities, DOJ emails exchanged between the Heritage Foundation

and Commission members, and documents from DHS related to the Commission's termination and transfer of operations to DHS).

Each agency identified the methods and terms for its searches. *See, e.g.*, Vanessa R. Brinkmann Decl., ECF 82. DOJ-OIP searched: "Election Integrity," "voter fraud," "voting system," the names of members of the Commission, "citizenship status," "voter registration list," "voter file data," "voter roll data," ("detail" AND "commission"), ("assignment" AND "commission"); other agencies used these or similar terms. OMB, in contrast, searched only "PACEI," or "election commission" or "election integrity commission." Heather Walsh Decl. ECF 78, at 6. DHS used even narrower terms: "Presidential Advisory Commission on Election Integrity" or "Election Commission" or "Commission" and "Voter Fraud." James Holzer Decl., ECF 88, at 6.

Another issue relates to private email accounts of agency personnel. One agency, DOJ-OLC, asked custodians to report if "potentially responsive agency records outside of a Department records system, such as in a personal email account," existed; the agency responded in the negative. ECF 83 ¶ 18. GSA reported that Assistant General Counsel Duane Smith had "contacted the GSA employees who were involved in providing administrative support services and they confirmed that they had not used any private emails to conduct GSA business." Lewis Decl., ECF 85 ¶ 11. In contrast, SSA made no such inquiry; it argues that, since SSA policy requires the use of agency accounts to conduct agency business, there was no point to ask if private email accounts were used. Chyn Decl., ECF 86 ¶ 11. Similarly, the DOJ-CRT information officer reported that although personal email accounts were used, the emails were forwarded to the official DOJ account and, therefore, there was no need to search personal email accounts." Cooper Decl., ECF 84 ¶ 14.

Plaintiffs cite use by at least two non-Commission agency employees of personal email accounts to send and receive emails relating to Commission matters, and argue that other records must exist outside the official records system. Acting Assistant Attorney General John Gore, for example, used his personal Gmail account to correspond about allegations of illegal voting with Chris Cleveland, a partisan political activist on voter fraud issues. Wedoff Decl., ECF 77-22, 77-23; Pl. Br., ECF 76, at 13. Gore later forwarded variations of his email thread with Cleveland to Commission member Christy McCormick, also via her personal AOL address, on July 5, 2017 and September 5, 2017. Wedoff Decl., ECF 77-22, 77-23. Eighty-four days after his first private email, on September 27, 2017, Gore forwarded both emails to his official DOJ account. *Id.*

In a second instance, Commission member J. Christian Adams sent at least two emails on voting integrity to DOJ attorney Maureen Riordan's personal Comcast address. Wedoff Decl., ECF 77-24, 77-25. Within a day of receiving the emails, Riordan forwarded them to her official DOJ account. *Id.*

**Legal Standards**

A court may "supervise the agency's ongoing progress, ensuring that the agency continues to exercise due diligence in processing the request. *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 189 (D.C. Cir. 2013); *see also* § 552(a)(6)(C). "FOIA imposes no limits on courts' equitable powers in enforcing its terms." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988); *see also Clemente v. Fed. Bureau of Investigation*, 71 F. Supp. 3d 262, 263, 269 (D.D.C. 2014); *Nat. Res. Def. Council v. Dep't of Energy*, 191 F. Supp. 2d 41, 42 (D.D.C. 2002).

"Summary judgment is the usual mechanism for resolving a FOIA dispute." *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 43 (S.D.N.Y. 2018). "[O]n a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (quoting *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315 (D.C. Cir. 2003)). The "search for records does not have to be perfect, only reasonable, and the failure to return all responsive documents is not necessarily inconsistent therewith: an agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010) (internal quotation marks removed). "Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search . . . are sufficient to sustain the agency's burden. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "These declarations are 'accorded a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'" *Landmark Legal Found. v. E.P.A.*, 959 F. Supp. 2d 175, 181 (D.D.C. 2013).

**Discussion**

Defendants argue, first, that their responses to Plaintiffs' search requests were adequate, and that the selection of search terms is the responsibility of the agencies, not the Plaintiff; and, second, that custodians enjoy a presumption of compliance with recordkeeping

regulations, without requiring them to search private email accounts to comply with a FOIA request. Plaintiffs argue that the search terms used by the two resisting agencies, DHS and OMB, plainly were inadequate and inconsistently narrower than the terms used by other agencies, and that custodians cannot turn a blind eye when private email accounts are used.

### A. The Appropriateness of the Search Terms

Plaintiffs challenge as inadequate the search terms adopted by OMB, which searched only "PACEI," or "election commission" or "election integrity commission," and by DHS, which searched "Presidential Advisory Commission on Election Integrity" or "Election Commission" or "Commission" and "Voter Fraud"—searches that were much narrower than, for example, DOJ-OIP, which searched "Election Integrity," "voter fraud," "voting system," the names of members of the Commission, "citizenship status," "voter registration list," "voter file data," "voter roll data," ("detail" AND "commission"), ("assignment" AND "commission"). James Holzer Decl., ECF 88, at 6; Heather Walsh Decl. ECF 87, at 6; Vanessa R. Brinkmann Decl., ECF 82, at 10–11.

Generally, agencies need show only that the search terms are reasonable and adequate to respond to a FOIA request. *See Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012). Adequacy requires that "the search was reasonably calculated to discover the requested documents, not [that] it actually uncovered every document extant." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (quoting *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

Federal agencies have discretion to craft the search terms that they believe to be reasonably tailored to uncover documents responsive to a FOIA request. *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015). FOIA petitioners cannot dictate

the search terms to be used. "Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search." *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015). However, an agency's choice of search terms is not conclusive. Where challenged, agencies have to explain why certain search terms, clearly relevant, were not used. *Immigrant Defense Project v. United States Immigration and Customs Enforcement*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016).

The contrast between the overly narrow search terms used by DHS and OMB, and those employed by the other agencies responding to essentially the same requests, is marked, and make clear the unreasonableness of DHS' and OMB's approach. DHS and OMB fail to explain why terms as obvious as those employed by sister agencies were not used. With blinkers on, the world can't fully be seen. I order defendants OMB and DHS to conduct their searches using the search terms employed by DOJ-OIP, that is, "Election Integrity," "voter fraud," "voting system," the names of members of the Commission, "citizenship status," "voter registration list," "voter file data," "voter roll data," ("detail" AND "commission"), ("assignment" AND "commission").

**B. Private Email Accounts**

Plaintiffs ask that Defendants search the private email accounts of two agency employees, John Gore and Maureen Riordan, and ask relevant agency employees to report if they have potentially responsive records outside of an official records system, such as in a private email account. Defendants argue that they need search only agency records, and that there is no evidence that private email accounts contained agency records that were not also included in an official government repository.

"[E]mployees' communications on non-agency accounts may constitute 'agency records' subject to the FOIA." *Wright v. Admin. for Children & Families*, No. 15-cv-218, 2016

WL 5922293, at *7–*8 (D.D.C. Oct. 11, 2016); *see also Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149 (D.C. Cir. 2016) ("[A]n agency always acts through its employees and officials. If one of them possesses what would otherwise be agency records, the records do not lose their agency character just because the official who possesses them takes them out the door or because he is the head of the agency."). "[A]n agency cannot shield its records from search or disclosure under FOIA by the expedient of storing them in a private email account controlled by the agency head . . . ." *Competitive Enter. Inst.*, 827 F.3d at 146. To preserve records within the scope of FOIA, statutes and regulations require agency employees to store records within official systems. 36 C.F.R. § 1236.22(b) ("Agencies that allow employees to send and receive official electronic mail messages using a system not operated by the agency must ensure that Federal records sent or received on such systems are preserved in the appropriate agency recordkeeping system."); *see also* 44 U.S.C. § 2911(a) (agency employees and officers "may not create or send a record using a non-official electronic messaging account" without copying or forwarding a copy of the record to the agency).

The record is clear that Acting Assistant Attorney Gore sent and received emails relating to voter fraud, and that DOJ attorney Riordan received emails discussing election integrity, on their private email accounts. Moreover, Gore was substantially late in forwarding emails from his private account to official accounts, beyond the twenty-day period required by 44 U.S.C. § 2911(a), for example, an email of July 5, 2017 that was not forwarded until September 27, 2017, eighty-four days later.

Evidence of a record on a personal account is sufficient to raise a question of compliance with recordkeeping obligations, rendering the presumption of compliance inapplicable. *Judicial Watch, Inc. v. Department of Justice,* 319 F. Supp. 3d 431, 438 (D.D.C.

2018) (finding search adequate that was not restricted to custodian's official account); *see also Wright*, 2016 WL 5922293 at *8 ("This presumption [of discharge of official duties] may be subject to rebuttal . . . ."). In this case, the existence of emails on personal accounts, and Gore's failure to forward emails timely, raise a material question whether "government email account[s] [are] the only record system likely to contain agency records responsive to [Plaintiffs'] FOIA requests." *Judicial Watch, Inc.*, 319 F. Supp. 3d at 438. The official custodians must ask relevant employees if they used private email accounts relating to the Commission's business and, if so, to produce the documents. *Cf. Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 241 F. Supp. 3d 14, 22 (D.D.C. 2017) (presumption applies where custodian files declaration showing 4,500 instances of compliance with email forwarding rule); *Wright*, 2016 WL 5922293 at *8 (presumption applies where agency counsel specifically consulted agency personnel).

The use of private email accounts to conduct official business has become commonplace. Mobile electronic devices and communication platforms have proliferated, and the boundaries between home and office, and personal and business travel, have blurred. Reports of public officials using personal accounts or devices to conduct official business and, at times, to evade disclosure regulations have become the subjects of public discourse. *See, e.g.*, Steve Zansberg, *Cloud-Based Public Records Pose New Challenges for Access*, 31 Comm. Law. 12, 12 (2015) (collecting reports); Daniel Pitcalm & Zoe Grotophorst, *The State of Internal Workplace Communication*, Government Executive (March 5, 2015), https://www.govexec.com/insights/state-internal-workplace-communication/106737/ (reporting that 33% of 412 government employees surveyed used personal email for government business).

In an environment of widespread use of personal devices for official work, there is danger of an incentive to shunt critical and sensitive communication away from official channels and out of public scrutiny, with decisions to forward the communications to official record repositories postponable at the whim of the public official. The practice is inconsistent with "the citizen's right to be informed about what their government is up to," the very purpose of FOIA. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal quotation marks and citation omitted); *see also Competitive Enter. Inst.*, 827 F.3d at 150. ("If a department head can deprive the citizens of their right to know what his department is up to by the simple expedient of maintaining his departmental emails on an account in another domain, [the] purpose [of FOIA] is hardly served."). The presumption argued by the Government is not applicable in this case.

The Government argues that the Plaintiffs' FOIA requests would burden hundreds or thousands of personal email accounts. This is not the case, and is not what Plaintiffs seek. Plaintiffs' requests are limited to two people, plus requests by the records custodians to relevant persons in their departments to search for, and forward, responsive private communications on matters relating to the Commission's business. Plaintiffs' requests are reasonable and are not barred by presumptions.

**Conclusion**

Plaintiffs' motion for partial summary judgment is granted, and Defendants' motion is denied. The parties shall meet and agree to a reasonable timeline for Defendants' production and, failing agreement, report to the Court by joint letter their items of disagreement. The Clerk is instructed to terminate the motions (ECF 75, 79).

SO ORDERED.

Dated:        April 30, 2019
              New York, New York

                                              ALVIN K. HELLERSTEIN
                                              United States District Judge